**WILDERNESS SOCIETY, a non-profit corporation, et al., Appellants**

**v.**

**J. Steven GRILES, Assistant Secretary, Department of Interior, et al.**

**No. 86–5205.**

United States Court of Appeals, District of Columbia Circuit.

Argued March 9, 1987.

Decided July 10, 1987.

As Amended July 14, 1987.

---

Ronald J. Wilson, Washington, D.C., for appellants.

Roger J. Marzulla, Deputy Asst. Atty. Gen., Dept. of Justice, with whom Robert L. Klarquist and Claire L. McGuire, Attys., Dept. of Justice, Washington, D.C., were on the brief for appellees, Dept. of Interior, et al.

Kenneth C. Powers, Asst. Atty. Gen., State of Alaska, Anchorage, Alaska, for appellee, State of Alaska. John W. Katz, Anchorage, Alaska, also entered an appearance for the State of Alaska.

Kenneth C. Bass III, with whom Steven W. Budd and Arthur Lazarus, Jr., Washington, D.C., were on the brief for appellees, Alaska Federation of Natives, Inc., et al. Jeffrey J. Peck, Washington, D.C., also entered an appearance for Alaska Federation of Natives.

John W. Angus III, Washington, D.C., was on the brief for appellees, Calista Corp. and Kwethluk, Inc.

Before WALD, Chief Judge, EDWARDS and GINSBURG, Circuit Judges.

Opinion for the Court filed by Chief Judge WALD.

WALD, Chief Judge:

Our largest state, estimated at between 357,000,000 and 375,000,000 acres, Alaska remains, to this day, an area with undetermined and shifting land ownership. The Alaska Statehood Act, passed in 1953, authorized the new state to select over 100,-000,000 acres of federal land from desig-

nated areas during a period of thirty-five years. Outstanding land claims by Alaskan native groups further complicated the uncertainty of land ownership in the state. In 1971, Congress passed the Alaska Native Claims Settlement Act, extinguishing aboriginal claims by granting Alaskan natives approximately 44,000,000 acres of land, also to be selected from designated areas.

The underlying issue in this case involves how claimed land in Alaska is surveyed. In 1983 the Bureau of Land Management (BLM) of the Department of the Interior (DOI) changed the policy governing the allocation of submerged lands underneath nonnavigable waters, providing that all such lands of sufficient size for measurement would be "meandered" (a special method of measuring the acreage of submerged lands) and excluded from the total acreage charged against the relevant group's land grant. (Navigable waters and their submerged lands are subject to state control in all cases.) So, for example, if prior to the new policy the state took a 100 acre parcel that included 20 acres of submerged lands, after the new policy it could take a 120 acre parcel that included the same 20 acres of submerged lands, because those 20 acres would not now be charged against its total grant amount.[1]

The Wilderness Society and the Sierra Club, plaintiff-appellants, are conservationist/environmental groups whose members use various wilderness areas and other public lands throughout Alaska for recreational activities.[2] They brought suit in District Court challenging the decision to exclude submerged lands from the amount of acreage charged against the state's or natives' grant as contrary to congressional intent. Plaintiffs claim that the necessary effect of the new allocation policy is to increase the number of acres shifted from federal to either state or native ownership, thereby injuring the groups and their members who use federal lands in Alaska.

The District Court, in an unpublished memorandum and order dated January 30, 1986, held that plaintiffs lack standing to challenge BLM's determination to exclude submerged lands from the total acreage charged against state or native grants. On the current record, we conclude as well that plaintiffs have not shown a sufficient likelihood of future injury to survive a motion for summary judgment. However, we find that the District Court erred in denying plaintiffs discovery pending resolution of defendants' motion to dismiss, and then deciding the standing question on defendants' alternative motion for summary judgment. Accordingly, we remand for further proceedings.[3]

I. BACKGROUND

A. *Laws and Lands*

1. *Applicable Laws*

a. *Alaska Statehood Act.* On January 3, 1959, Alaska became our forty-ninth state. Proclamation No. 3269, 24 Fed.Reg. 81 (1959). The Alaska Statehood Act (ASA), passed the previous summer, granted over 100,000,000 acres to the state, "from the public lands of the United States in Alaska which are vacant, unappropriated, and unreserved at the time of their selection," to be selected "within thirty-five years after the admission of Alaska into the Union." Pub.L. No. 85–508, § 6(a) & (b), 72 Stat. 339 (1958), 48 U.S.C. prec. § 21.

---

1. Estimates of how many additional acres of land will ultimately be conveyed to state and native hands as a result of the new rule range from several hundred thousand to six million. *See* Pl.Br. at 10–11.

2. Defendants in the case are the Assistant Secretary of the Interior for Lands and Mineral Management, in charge of BLM, and the Secretary of the Interior. Intervenors for defendants are the state of Alaska, the Alaska Federation of Natives, Bristol Bay Native Corporation, Calista Corporation, Doyon, Ltd., and Kwethluk, Inc.

We refer to defendants as BLM except where we discuss a statutory provision that refers to the "Secretary."

3. In addition, we direct the District Court to consider plaintiffs' claims under the National Environmental Policy Act, and affirm its dismissal of plaintiffs' Administrative Procedure Act claim and its denial of plaintiffs' motion to amend their complaint. *See* parts III.A.-C., *infra.*

b. *Alaska Native Claims Settlement Act.* Congress enacted the Alaska Native Claims Settlement Act (ANCSA) in 1971, extinguishing aboriginal title claims to certain Alaskan lands by granting the natives approximately 44,000,000 acres plus substantial monetary payments. Under ANCSA, local village corporations and broader-based regional corporations may select lands from those withdrawn from public use. 43 U.S.C. §§ 1610–11. Regulations promulgated pursuant to the Act permit the village and regional corporations to *select* acreage in excess of their entitlements and to prioritize those selections, though only the statutorily prescribed acreage may actually be *conveyed.* 43 C.F.R. §§ 2651.4(f) & 2652.3(f) (1986).

c. *Alaska National Interest Lands Conservation Act.* Though plaintiffs do not allege its violation, the Alaska National Interest Lands Conservation Act (ANILCA) is nonetheless relevant to the case for three reasons. First, it authorizes the state to select acreage in excess of its entitlement under ASA, and to prioritize such selections. 43 U.S.C. § 1635(f). Second, its section on "Status of lands within units" helps explain how federal wilderness lands may be affected by the challenged decision. Third, along with ASA and ANCSA, ANILCA provides the support for our conclusion that plaintiffs pass the "zone of interests" standing test.

### 2. *Lands That May Be Selected*

The state and natives may select their entitlements from either public lands under BLM management (BLM lands), which are generally open to either state or native selection, or from Conservation System Units (CSUs), established by ANILCA, which include national parks, national wildlife refuges, national conservation and recreation areas, national forests, and national wild and scenic rivers.[4] An ANILCA section entitled "Status of lands within units" helps explain how CSUs may be

transferred from federal to state or native hands:

(1) Notwithstanding any other provision of law, subject to valid existing rights any land withdrawn pursuant to section 17(d)(1) of the Alaska Native Claims Settlement Act [43 U.S.C. § 1616(d)(1)] and within the boundaries of any conservation system unit, national recreation area, national conservation area, new national forest or forest addition, shall be added to such unit and administered accordingly unless, before, on, or after December 2, 1980, such land has been validly selected by and conveyed to a Native Corporation, or unless before December 2, 1980, such land has been validly selected by, and after December 2, 1980, is conveyed to the State. At such time as the entitlement of any Native Corporation to land under the Alaska Native Claims Settlement Act is satisfied, any land within a conservation system unit selected by such Native Corporation shall, to the extent that such land is in excess of its entitlement, become part of such unit and administered accordingly: *Provided,* That nothing in this subsection shall necessarily preclude the future conveyance to the State of those Federal lands which are specified in a list dated October 19, 1979, submitted by the State of Alaska and on file with the Office of the Secretary: *Provided further,* That nothing in this subsection shall affect any conveyance to the State pursuant to subsections (b), (c), (d), or (g) of this section.

(2) Until conveyed, all Federal lands within the boundaries of a conservation system unit, national recreation area, national conservation area, new national forest or forest addition, shall be administered *in accordance with the laws applicable to such unit.*

43 U.S.C. § 1635(*o*).

Thus, if land within a CSU is validly selected by and conveyed to a native corporation at any time, it passes to native ownership and out of the CSU. Similarly, land

---

4. *See* Pub.L. No. 96–487, 94 Stat. 2371, 2377–2417 (1980) (codified in scattered sections of the United States Code).

selected before and conveyed after the passage of ANILCA may pass validly into state hands. Hence, it is clear that CSU lands may be affected by state or native selections.[5]

### B. *Proceedings in This Case*

On December 5, 1983, BLM published an "Interim Waiver of Regulations and Establishment of Policy," which was summarized in the Federal Register as follows:

> This rule waives 43 CFR 2650.5–1(b) pending the publication of final rules reflecting the Department's change in policy related to the chargeability of submerged lands, and establishes a policy that will not require that certain submerged lands be charged against the entitlement of Alaska Native corporations pursuant to the Alaska Native Claims Settlement Act or against the entitlement of the State of Alaska pursuant to the Alaska Statehood Act.

48 Fed.Reg. 54,483 (1983). Thus, the rule changed the published regulations regarding the chargeability of submerged lands against *native* entitlements, and it altered an unpublished policy regarding the chargeability of submerged lands against *state* entitlements.

BLM took no further action with regard to the state; thus, the "establishment of policy" announced in the rule, by itself, determined that submerged lands would not be charged against the state entitlement. As for the natives, BLM followed the interim waiver with a notice of proposed rulemaking, 49 Fed.Reg. 31,475 (1984), and, after a notice and comment period, a final rulemaking. 50 Fed.Reg. 15,546 (1985). BLM never strayed from its decision in the interim waiver that submerged lands would not be charged against native selections. Finally, the new policy dictated that state selections not yet conveyed and all native selections, whether conveyed or not, would be resurveyed so that acreage underneath nonnavigable waters could be subtracted from the charged total. *See* 48 Fed.Reg. at 54,483 (regarding states and initial determination regarding natives); 43 C.F.R. § 2650.5–1(b) (1986), 50 Fed.Reg. at 15,547 (final regulation regarding natives).

The Wilderness Society and the Sierra Club brought suit on June 14, 1984, in a

---

**5.** Intervenor Calista Corporation (a native corporation) argues that 43 U.S.C. § 1621(j)(2) prohibits new selections within CSUs. That section provides that if a native corporation has selected fewer acres than its granted amount, the Secretary may withdraw from public appropriation twice the amount of the unfulfilled entitlement and give the corporation ninety days to pick from those withdrawn lands. First, he must withdraw for that corporation's benefit "public lands that were formerly withdrawn for selection by the concerned Village Corporation." If such lands are no longer available, he may then withdraw "public lands that are vacant, unreserved, and unappropriated, except that [he] may withdraw public lands which had been previously withdrawn pursuant to [43 U.S.C. § 1616(d)]." Although it does not explicate its argument, Calista apparently reads this provision as excluding new selections within CSUs because those lands are not "vacant, unreserved, and unappropriated."

There are two problems with this reading. First, § 1621(j)(2) only addresses what the Secretary may do if a native corporation has underselected, and does not speak to the more straightforward process of selections by the natives themselves.

Second, even with regard to underselection, § 1621(j)(2)'s "except" clause, referring to lands previously withdrawn pursuant to § 1616(d), re-

veals Calista's error. Section 1616(d) provides the general power for the Secretary to withdraw federal public lands in Alaska from all forms of public appropriation. Section 1635(*o*), discussed above in the text, stipulates that certain types of lands that the Secretary might have withdrawn pursuant to § 1616(d)—*i.e.*, land "within the boundaries of any conservation system unit, national recreation area, national conservation area, [and] new national forest or forest addition"—shall *not* become part of the units in question if selected by and conveyed to the natives at any time, or if selected by the state before December 2, 1980, and conveyed to the state after that date. Section 1621(j)(2) is completely consistent with this scheme, for although it generally permits the Secretary to withdraw in the case of native underselection only "vacant, unreserved, and unappropriated" public lands, which do not include CSUs, it specifically excepts from this rule "public lands which had been previously withdrawn pursuant to [§ 1616(d)]," which include CSUs.

Therefore, § 1635(*o*) permits new selections by natives within CSUs withdrawn from public use under § 1616(d), and § 1621(j)(2) permits CSUs to be withdrawn to remedy native underselection. We therefore reject Calista Corporation's suggestion that "[n]ew selections within conservation system units are prohibited by 43 U.S.C. § 1621(j)(2)."

five count complaint. Plaintiffs first alleged that the interim waiver and establishment of policy constituted a rulemaking, and therefore should have been preceded by a notice and comment period. 5 U.S.C. § 553. Second, plaintiffs claimed that BLM was required to prepare an environmental impact statement (EIS), because the policy shift was a "major federal action significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). Third, plaintiffs argued that BLM should have prepared an environmental assessment (EA) to determine whether or not an EIS was necessary. 40 C.F.R. § 1501.4 (1986). Fourth and fifth, plaintiffs contended that both ASA and ANCSA require submerged lands underneath nonnavigable waters to be charged against state and native entitlements, and therefore that the new policy violates both laws. Plaintiffs asserted federal court jurisdiction under 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 2201–02 (declaratory judgment); the Administrative Procedure Act (APA), 5 U.S.C. § 702, provided the cause of action, permitting plaintiffs to complain of injury inflicted by agency action.

The District Court dismissed the entire complaint for lack of standing. *Wilderness Society v. Carruthers*, No. 84–1823 (D.D.C. Jan. 30, 1986), Joint Appendix (J.A.) at 1. Although plaintiffs had alleged that the transfer of additional lands to state and native hands would injure their members' interests in the use of those lands for recreational purposes,[6] the court held that plaintiffs lacked personal injury. First, the court said that "BLM's new policy will not cause any injury until such time that the State and Native corporations acquire title ... to at least one acre more than allotted by statute." *Id.* at 11. Second, the court maintained that "[p]laintiffs do not, and ... cannot, identify *specific* land in Alaska

that will be transferred to the State or Native corporations as a direct result of the new BLM policy on chargeability." *Id.* at 12 (emphasis in original). Thus, the court found that plaintiffs' alleged injuries could not be tied to a particular time or place and were thus too speculative for plaintiffs to be considered "aggrieved by agency action" within the meaning of section 10 of the APA, 5 U.S.C. § 702.

Additionally, the court held that causation was absent, *i.e.*, that plaintiffs' alleged injuries were not fairly traceable to BLM's actions and furthermore that judicial relief would not be likely to redress those injuries. *Id.* at 15–17. The court concluded that the chain of events that must occur between the promulgation of the new policy and any injury to plaintiffs was too speculative, and therefore any decrease in public access could not be fairly traced to the BLM policy. The court also held that an order reinstating the old submerged lands chargeability policy would not be likely to lead to greater overall public access, because plaintiffs had failed to show that injury was less likely to occur under federal ownership.

Finally, the court noted that prudential considerations "militate against this court's becoming enmeshed in what is basically a problem of proper land accounting long before the necessary acts of surveying and conveyancing have taken place." *Id.* at 18. Finding no injury, the court did not decide whether the interests sought to be protected by plaintiffs arguably fell within the zone of interests protected or regulated by a relevant statute.

This appeal followed.

## II. STANDING

### A. *The Status of Threatened Injury in Standing Law*

When a claim arises under § 702 of the APA, we must determine whether plain-

---

6. An association may, of course, sue on its own behalf and on behalf of its members. *See, e.g., Warth v. Seldin*, 422 U.S. 490, 511, 95 S.Ct. 2197, 2211–12, 45 L.Ed.2d 343 (1975). Plaintiffs appear to claim that both their members' interests and their own interests are injured by the new BLM policy; indeed, not only do plaintiffs' members travel and recreate throughout Alaska, but also plaintiffs themselves sponsor trips in the state. *See* J.A. at 28–30. Establishing injury to plaintiffs' members through the loss of access to natural resources for recreational use is critical to both individual and associational standing claims; thus, we focus throughout the opinion on this basic injury.

tiffs are "adversely affected or aggrieved by agency action within the meaning of a relevant statute." In other words, plaintiffs must show that "the challenged action ha[s] caused them injury in fact" and that the injury is "to an interest arguably within the zone of interests to be protected or regulated by the statutes that the agencies were claimed to have violated." *Sierra Club v. Morton*, 405 U.S. 727, 733, 92 S.Ct. 1361, 1365, 31 L.Ed.2d 636 (1972) (internal quotations omitted). Although the analysis of whether a plaintiff is "aggrieved" within the meaning of § 702 and whether he has alleged a "case or controversy" under Article III of the Constitution are, and should be, analytically distinct questions, the Supreme Court has interpreted both § 702 and the Constitution as requiring plaintiffs to show that they are personally injured by the challenged action and that their injury is caused by that action. *See, e.g., Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982) (discussion of Article III); *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 96 SCt. 1917, 48 L.Ed.2d 450 (1976) (suit under the APA, discussion nonetheless of the Constitution); *Sierra Club* (APA). The personal injury may be "actual or threatened." *Valley Forge*, 454 U.S. at 472, 102 S.Ct. at 758–59 (internal quotation omitted). Although the mere threat of an injury might at first glance appear not to render a party "aggrieved by agency action," and may seem noncognizable in a judicial system given jurisdiction over only cases or controversies, the Supreme Court has accommodated allegations of threatened injury in two settings.

The first setting involves cases in which the plaintiff alleges that governmental action will be taken directly against him. In the context of preenforcement review of agency action, the Court has inquired whether the challenged regulation would certainly apply to behavior in which the plaintiff intends to engage. *Compare Ab-*

bott Laboratories v. Gardner*, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), *with Toilet Goods Association v. Gardner*, 387 U.S. 167, 87 S.Ct. 1530, 18 L.Ed.2d 704 (1967) and *National Latino Media Coalition v. FCC*, 816 F.2d 785 (D.C.Cir.1987). Similarly, "[w]hen contesting the constitutionality of a criminal statute," a plaintiff may seek a declaratory judgment if he has "alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by statute, and there exists a credible threat of prosecution thereunder...." *Babbitt v. United Farm Workers*, 442 U.S. 289, 298, 99 S.Ct. 2301, 2309, 60 L.Ed.2d 895 (1979) (internal quotation omitted). Furthermore, the Court has refused to allow suits seeking injunctive relief to bar unconstitutional governmental practices unless the plaintiff can show that the governmental entity in question has a policy authorizing the unconstitutional practices to which he has credibly alleged he would again be subject. *See, e.g., O'Shea v. Littleton*, 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974). In all these cases involving claims of threatened injury emanating directly from governmental conduct, the Court has assessed the likelihood that the clash between the government and the plaintiff will in fact occur.

The other setting comprises cases in which the government acts directly against a third party, whose expected response in turn will injure the plaintiff. The standing question in these three-party [7] cases frequently turns not on the existence of personal injury but rather on so-called causation issues, *i.e.*, whether the third party's decision is sufficiently dependent upon the governmental action that plaintiff's injury is "fairly traceable" to that action and is "likely to be redressed" by an order binding the government. *See, e.g., Allen v. Wright*, 468 U.S. 737, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984); *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450

---

**7.** Although we refer to the "third party" and to "three-party cases," we do not mean to imply that the third party is actually a party to the

case before the court, but rather that he is party (in the broader sense of the term) to the underlying dispute.

(1976); *Warth v. Seldin,* 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). When personal injury *is* at issue in a three-party case, it usually depends upon how likely it is that the third party's response to the challenged governmental action will injure the plaintiff *at all.*

In a pair of environmental lawsuits directly relevant to today's case, the Supreme Court has explained how a plaintiff may show threatened personal injury in a three-party setting. When the plaintiff in *Sierra Club v. Morton,* 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972), argued that the government's decision to permit private development of a national game refuge would injure its general interest in the conservation of national parks, the Court denied standing, finding that "[t]he Sierra Club failed to allege that it or its members would be affected in any of their activities or pastimes by the ... development." *Id.* at 735, 92 S.Ct. at 1366. The successful plaintiff in *United States v. SCRAP,* 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973), on the other hand, alleged that its members' use of natural resources "surrounding the Washington Metropolitan area," *id.* at 678, 93 S.Ct. at 2411, would be injured by a chain of third-party responses to an ICC rate decision. Thus, cases like *Sierra Club* and *SCRAP* parallel in the three-party context the search for likelihood of injury that governs standing law in the two-party context. In both settings, the Court attempts to predict what the government's and/or third party's actions will be and requires a credible allegation that the plaintiff's course of behavior

will be harmed by the carrying out of those actions.

To sum up, whether an allegation of threatened injury suffices for standing turns on the likelihood of the occurrence of that injury. In a two-party case, a court can simply determine whether a governmental law, rule, or policy will be applied to the plaintiff's planned conduct. In a three-party case, the court must ascertain whether the third party's response to governmental action will, likewise, affect the plaintiff's intended behavior. Where the alleged injury involves access to land in a three-party case, as in *Sierra Club, SCRAP,* and the case at bar, the judgment regarding likelihood of injury turns on whether the plaintiff's future conduct will occur in the same location as the third party's response to the challenged governmental action. Otherwise, the threat of injury would be too amorphous or uncertain; it would be no greater for the plaintiff than for any person simply opposed to the governmental action in question. In short, the issue in each case is whether the plaintiff has put forward enough facts to show that his intended behavior will be injured as a direct or indirect result of the challenged governmental action.[8]

As we discuss in detail below, although it is clear that additional lands will be transferred out of federal hands as a result of the challenged policy, plaintiffs have not pointed to any specific lands that they wish to use that will be so transferred. Hence, they are unable to show a sufficient threat of injury to bring them into line with the applicable precedents.

---

8. An example of a three-party threatened injury case not involving the use and enjoyment of land is *Blum v. Yaretsky,* 457 U.S. 991, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982). The plaintiffs sought an injunction against the New York State Commissioners of Social Services and Health, alleging that the defendants had adjusted Medicaid payments in response to procedurally unconstitutional nursing home decisions to discharge patients or to transfer them to lower levels of care. "In light of similar determinations already made by the committee of physicians chosen by the facilities to make such assessments," the Court found the "threat [of injury] quite realistic." *Id.* at 1001, 102 S.Ct. at

2784. Accordingly, the Court concluded "that the threat of facility-initiated discharges or transfers to lower levels of care is *sufficiently substantial* that respondents have standing to challenge their procedural adequacy." *Id.* at 1000, 102 S.Ct. at 2784 (emphasis added). The Court saw that it was only a matter of time before the procedures would be used against the plaintiffs, given that they were residents of nursing homes that had a practice of utilizing (allegedly) unconstitutional procedures. In other words, the plaintiffs did not merely constitute an amorphous group seeking better nursing home procedures, but rather were people actually located within those homes.

## B. *Whether Plaintiffs Have Standing in This Case*

Many of plaintiffs' members have visited and will visit many federal lands throughout Alaska for recreational and study purposes. *See* Plaintiffs' Answers & Objections to Intervenor-Defendant Alaska Federation of Natives' First Set of Interrogatories, J.A. at 62–74, Rec. No. 29; Deposition of David McCargo (Sierra Club member), J.A. at 140–61, Rec. No. 48; Deposition of Jack Hession (Sierra Club member), J.A. at 78–139, Rec. Nos. 49, 53; Deposition of David Spencer (Sierra Club member), J.A. at 162, Rec. No. 51. However, plaintiffs are unable to name any *specific* lands that they intend to visit that either have been or will be shifted from federal to state or native ownership. Defendants argue that this failure to name a specific site of injury condemns plaintiffs' suit; additionally, they contend that it may be many years hence before either the state or the natives go over their original ASA and ANCSA limits and enter into possession of extra lands due to the BLM policy at issue today.

### 1. *Timing of Injury*

The District Court agreed with defendants' argument that the effect of the new allocation policy will not be felt in the immediate future, holding that "BLM's new policy will not cause any injury until such time that the State and Native Corporations acquire title ... to at least one acre more than allotted by statute." J.A. at 11. Although we ultimately hold that plaintiffs have not proved standing on this record because they have failed to name a specific situs of injury, we deem it necessary to the guidance of the District Court on remand to point out the error of its conclusion that the injury will not occur until one acre more than the initially granted sum is conveyed.

■ a. *State.* To understand fully the effect of the new policy on the state's allotment, we must examine an additional argument raised by the state. Alaska contends that since 43 U.S.C. § 1635(*o*) permits it to take conveyance on CSU lands (refuges, forests, etc.) only if it had select-ed such lands prior to December 2, 1980, the new policy, promulgated after that date, will not alter the particular CSU lands ultimately conveyed to the state. Alaska explains that even though ownership of non-CSU federal lands (the BLM lands) may be transferred as a result of the policy, plaintiffs do not allege injury from the possible diminishment of the BLM lands, but only from the supposed decrease in CSU lands. Therefore, any additional conveyances to the state pursuant to the challenged policy will come from the BLM lands and will not injure plaintiffs.

This argument fails for two reasons. First, plaintiffs do not allege that their injury stems only from the effect of the challenged policy on CSU lands. Plaintiffs' complaint avers that their members use the "public lands in Alaska," "the federal public lands." J.A. at 29–30, Rec. No. 1. Plaintiffs' answer to an interrogatory regarding which lands they had visited includes references such as "National forests *and adjacent lands* in Southeast Alaska." J.A. at 67–68, Rec. No. 29 (emphasis added). Thus, it appears that plaintiffs' threatened injury derives from the additional conveyance of BLM lands as well as CSU lands, and that Alaska's argument about the fixed status of CSU selections is therefore irrelevant. *See* Pl.Br. at 20 ("[Plaintiffs' members] have also conducted [various travel and recreational] activities on unreserved federal lands [*i.e.,* BLM lands].").

Second, Alaska's argument ignores the significant effects of overselection and prioritization on the future of the natural resources that plaintiffs seek to conserve for their recreational use. Section 1635(f) of 43 U.S.C. provides Alaska with a "Right to overselect," permitting the state to "select lands exceeding by not more than 25 per centum in total area the amount of State entitlement which has not been patented or tentatively approved under each grant or confirmation of lands to the State contained in the Alaska Statehood Act or other law." "If its selections under a particular grant exceed such remaining entitlement," then the state is required to "list all

selections for that grant which have not been tentatively approved in desired priority order of conveyance, ... except that the State may alter such priorities prior to receipt of tentative approval."

The existence *vel non* of submerged lands within selected but unconveyed areas may well affect the state's prioritization—and, ultimately, conveyance—decisions. For example, assume that before the new policy the state had ranked first on its priority list a selected but unconveyed portion of the Yukon Flats National Wildlife Refuge, and had ranked second on that list an identically sized selected but unconveyed portion of the Kenai National Wildlife Refuge. Assume further the existence of a large number of submerged lands in the Kenai but not the Yukon portion. The new policy would likely influence the state to alter the priorities of these two portions, because by taking the Kenai portion first it would be charged for fewer acres than if it took the Yukon portion, while actually receiving the same number of acres as if it took the Yukon portion. Thus, the new policy may well affect which CSU lands remain in federal hands and which shift over to state ownership.

The overselection and prioritization scheme also explains why plaintiffs need not necessarily wait until the new policy assures the state or natives one acre more than the statutorily granted amount. New prioritizations may take place well before that date, and any injury due to those new prioritizations would not occur *but for* the new policy. Although we need not decide today whether the reordering of priorities would injure plaintiffs at the time of the selection shift, the resulting conveyance, or the actual denial of access, we do reject the District Court's view that injury can only occur when the total number of acres exceeds the statutorily granted limit.

■ b. *Natives.* Our analysis is similar with regard to the effect of the new policy on the native allotment. Native overselection and prioritization are provided by regulation. 43 C.F.R. §§ 2651.4(f) & 2652.3(f) (1986). While it is not clear from these regulations whether or not the natives may shift their priorities (*but see infra*), even stronger evidence exists than in the case of the state to show the current effect of the challenged policy with regard to the natives. Plaintiffs have submitted copies of twenty-two letters from the BLM Branch of ANCSA Adjudication informing various native village corporations of the precise number of additional acres they are entitled to as a result of the challenged policy.[9] A summary of one of these letters reveals that the new submerged lands policy is already affecting native acreage allotments.

■ BLM wrote to Atmautluak Limited (a native village corporation) on September 23, 1985, to inform it of the new policy regarding the surveying of submerged lands, and of the specific effect of the policy on Atmautluak's selections. Atmautluak's statutory entitlement is 92,160 acres. It had received conveyance of 83,013 acres, and therefore was owed 9,147

---

9. These letters were not made part of the record below; evidently, plaintiffs, who were cut off from discovery early in the case, did not obtain them until the submission of their reply brief on appeal. The letters, however, were the subject of discussion during oral argument; despite the federal government counsel's comment that the letters had been "stuck in the Appendix to an appellate brief," no one challenged their authenticity. Indeed, counsel for the natives referred specifically in his argument to the same letter to the village of Atmautluak that we discuss in the text, *infra,* his point being that if all the submerged lands for which Atmautluak was being credited turned out to be navigable, then the letter would have no effect. We reject the factual premise of this argument. The only submerged lands to be declared navigable are those the state challenges; all other submerged land selections are deemed nonnavigable, and therefore affected by the chargeability rule at issue. Indeed, plaintiffs assert, apparently without contest, that under the new rule BLM no longer, as a threshold matter, bothers to make navigability determinations at all, but instead simply excludes submerged lands automatically from acreage totals. Pl.Rep.Br. at 15. With regard to the letters, we need not decide whether their annexation to the brief on appeal may be used to support standing. Since the matter is being remanded to the District Court, plaintiffs will have the opportunity to support and defendants to challenge the authenticity of the letters in the court below. If duly admitted into the record, the letters will provide support for plaintiffs' standing in the manner discussed in the text.

acres. BLM credited Atmautluak, however, as a result of the new policy, with 14,835.03 *additional* acres due to submerged lands contained within the 83,013 acres already conveyed. Thus, Atmautluak's remaining entitlement was calculated (with some minor adjustments) at approximately 24,000 acres. Next, BLM listed the lands that would be conveyed off Atmautluak's priority selection list to reach the statutory ceiling. BLM then informed Atmautluak that it was free to change its priorities.

This and similar letters to other villages reveal that BLM is moving rapidly to implement the challenged policy. By informing the various native corporations that their already conveyed acreage contains submerged lands for which they are to receive credits in the form of additional lands, BLM has removed any tint of speculativeness regarding the effect of the policy on the native allotment. (We observe also that these letters indicate that BLM apparently construes its regulations to permit alteration of the natives' priority lists, thus making the native situation with regard to overselection and prioritization identical to that of the state.) Any harm to plaintiffs that results from these letters implementing the new policy would not occur *but for* the policy; as with reprioritizations, the injury would occur when the letters do their damage with regard to specific lands, and this could well happen before extra acres over the statutorily granted limit are affected.

### 2. *Location of Injury*

██ Although the new policy is currently being implemented, plaintiffs have not been able to point to any specific land that they intend to use that has been affected by the policy. That is, although both the state and the natives may be currently making prioritization shifts due to the policy, and although the natives have been authorized to make new selections due to the policy, there is no evidence in the record that identifies any specific land that is both affected by the policy *and* intended for the use of plaintiffs' members. In fact, there is no evidence in the record reflecting the specific location of *any* new prioritizations, selections, conveyances, or denials of access as a result of the policy. This is not to say that such responses to the new policy have not occurred; we simply do not know whether or not they have. This deficiency in the record may stem from the District Court's denial of plaintiffs' discovery request, a denial we ultimately find to be an abuse of discretion. Plaintiffs, however, argue for discovery only in the alternative; they maintain also that the record as it now stands provides sufficient evidence of personal injury to give them standing.

We disagree. *Sierra Club* and *SCRAP* teach that when an alleged injury involves the use and enjoyment of land, it is not enough that plaintiffs have a generalized interest in preserving such use and enjoyment. Rather, plaintiffs must allege that they or their members will suffer particularized injury from being denied the use and enjoyment of the land. Plaintiffs say that the new policy in this case will result in fewer public lands, that they use and enjoy various public lands throughout the state, and therefore that they are threatened with injury. This syllogism, however, is not complete, for it is possible that none of the public lands affected by the new policy will be ones that plaintiffs use and enjoy. This absence of specificity regarding location dooms plaintiffs' claim of threatened injury. As we have discussed above, in order to show sufficient likelihood of injury, a plaintiff must adduce facts that reveal how his planned behavior will be injured by the challenged governmental action and third-party response. Where the claimed injury involves access to land, the required showing involves the specification of the land that the plaintiff intends to use that the challenged action will affect. Otherwise, we cannot be certain enough that the plaintiff will himself be among the injured.

In this case, plaintiffs have shown through their complaint, answers to interrogatories, and deposition testimony, that their members use and intend to use various specified federal public lands through-

out Alaska. Plaintiffs have also submitted letters from BLM to specific native tribes regarding credited acreage due to the new policy; since ANCSA and its implementing regulations require that native selections be contiguous, *see* 43 U.S.C. § 1611(a)(2) & 43 C.F.R. § 2651.4(b) (1986), plaintiffs can state with certainty that the credited acres must come from lands abutting existing native holdings. But plaintiffs' proof proceeds no further; since they do not know which of the many possible abutting lands will actually be affected by the new policy, plaintiffs cannot tell us whether or not the lands they intend to use are among them. This lack of specificity, thus, prevents plaintiffs from showing a sufficient likelihood of *personal* injury.

The distinction in *SCRAP* between the levels of specificity required to withstand a motion to dismiss and a motion for summary judgment is central to our conclusion. In *SCRAP*, the Court found that a complaint should not have been dismissed for lack of standing even though plaintiff had alleged injury only due to its members' use and enjoyment of natural resources "surrounding the Washington Metropolitan area." 412 U.S. at 678, 93 S.Ct. at 2411. The Court held that despite its lack of specificity, this allegation was enough to survive a motion to dismiss. The main thrust of the *SCRAP* opinion, however, was to distinguish *Sierra Club*, in which plaintiff had alleged a truly generalized interest in conservation and the environment. Plaintiff's allegation in *SCRAP* that its members actually used and enjoyed the natural resources in question brought it within the personal injury circumscription that the Court had delineated in *Sierra Club*. But in a critical footnote, the *SCRAP* Court acknowledged that on a motion for summary judgment plaintiff might have had to show injury with greater specificity, *i.e.*, to name the specific forests that it uses and enjoys that would be affected by the challenged action. *Id.* at 689–90 n. 15, 93 S.Ct. at 2417 n. 15. And the Court has since reiterated that *SCRAP* indeed might have come out differently had it been decided on a motion for summary judgment. *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 45 n. 25, 96 S.Ct. 1917, 1927 n. 25, 48 L.Ed.2d 450 (1976). In sum, while a motion to dismiss may be decided on the pleadings alone, construed liberally in favor of the plaintiff, a motion for summary judgment by definition entails an opportunity for a supplementation of the record, and accordingly a greater showing is demanded of the plaintiff. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986) (emphasis added) ("Rule 56(c) mandates the entry of summary judgment, *after adequate time for discovery* and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.").[10]

---

**10.** The distinction between a motion to dismiss and a motion for summary judgment drawn in *SCRAP* becomes somewhat difficult to understand when one considers that the motion to dismiss was evidently based on want of jurisdiction (Rule 12(b)(1)), rather than on failure to state a claim (Rule 12(b)(6)). One of the "important distinctions between a dismissal pursuant to subdivision b(1) and one under b(6) ... [is that under b(1)] the court is not restricted to the face of the pleadings, but may review any evidence, such as affidavits and testimony, to resolve factual disputes concerning the existence of jurisdiction to hear the action." 2A J. Moore & J. Lucas, Moore's Federal Practice, ¶ 12.07(2.–1), at 12–45–46 (1986). The Fifth Circuit has persuasively discussed a district court's duty in response to a Rule 12(b)(1) motion:

[T]he district court must give the plaintiff an opportunity for discovery and for a hearing that is appropriate to the nature of the motion to dismiss. Thus, some courts have refused to grant such a motion before a plaintiff has had a chance to discover the facts necessary to establish jurisdiction.... Other courts have refused to uphold such a motion where—absent an incurable defect in the complaint—the plaintiff has had no opportunity to be heard on the factual matters underlying jurisdiction.... And, although [Rule] 43(e) allows factual motions to be heard on the basis of affidavits alone, a judge may be required to hear oral testimony where the facts are complicated and testimony would be helpful.... Insofar as the defendant's motion to dismiss raises factual issues, the plaintiff should have an opportunity to develop and argue the facts in a manner that is adequate in the context of the disputed issues and evidence.

*Williamson v. Tucker*, 645 F.2d 404, 414 (5th Cir.1981); *see also Hohri v. United States*, 782 F.2d 227, 241 (D.C.Cir.1986), *rev'd on other*

In this case, the District Court had before it defendants' motion to dismiss and cross-motions for summary judgment. The court's accompanying memorandum opinion, however, clarifies that it was looking beyond the pleadings. After noting that *SCRAP* had been decided on a motion to dismiss and might have been decided differently on a motion for summary judgment, *see supra*, the District Court concluded that "[h]aving motions for summary judgment before us and submissions outside the pleadings from the parties, we are not so limited in our inquiry." J.A. at 14. Therefore, plaintiffs' failure to show specificity of location condemns their standing case. However, the District Court's protective order denying discovery may have deprived plaintiffs of critical information that might have bolstered their case. Thus, we ultimately hold below that the District Court should not have denied plaintiffs' discovery requests specifically targeted at information pertinent to standing *and* granted defendants' motion for *summary judgment.*

### 3. Causation of Injury

Plaintiffs lack standing due to the absence of specific evidence of personal injury. Because, however, the District Court also held that causation was absent, and because the causation issue will again arise if plaintiffs on remand can supplement the record through additional discovery so as to show personal injury, we find it advisable to correct the District Court's causation holding.

■ For standing to exist under either § 702 of the APA or the Constitution, personal injury must be " 'fairly' traceable to the challenged action, and relief from the injury must be 'likely' to follow from a favorable decision." *Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984). *See also Simon v. Eastern Kentucky Welfare Rights Orga-*

*nization,* 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976); *Warth v. Seldin,* 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). While the personal injury inquiry focuses on concrete facts about harm to the plaintiff, causation questions concern the directness of the link between the defendant's challenged action and the alleged injury, and focus on the incentive structure to which the intervening third party, who directly causes the injury, is responding. If the third party's conduct is sufficiently dependent upon the incentives provided by the defendant's action, then the resultant injury will be fairly traceable to that action and a court order binding the defendant will likely cure the plaintiff's harm.

These quite separate personal injury and causation inquiries have unfortunately gotten mixed up in this case. The District Court held that the alleged injury could not be fairly traced to the new policy because it is uncertain whether the new policy will actually lead to decreased public access to formerly federal lands. This uncertainty, the District Court explained, is due to an "entire chain of events" that must occur before plaintiffs are harmed, such as BLM determinations regarding credited acreage and nonnavigability, state and native selections and conveyances, and subsequent privatization. J.A. at 15–17. Additionally, the District Court held that the alleged injury would not likely be remedied by a reinstatement of the old measurement policy, because plaintiffs must rely upon an "assumption" that injury to their interests is less likely to occur under federal ownership. J.A. at '17.

On appeal, the parties have followed the District Court's lead and argued over whether public access rights are likely to shift with shifting land ownership, focusing on differences between state and federal law, historical instances of native assertions of private ownership, and more gener-

grounds, —— U.S. ——, 107 S.Ct. 2246, 96 L.Ed.2d 51 (1987).

Thus, although a Rule 12(b)(1) motion cannot be converted into a motion for summary judgment as a Rule 12(b)(6) motion can, *see* Fed.R. Civ.P. 12(b), a district court can assure that appropriate extra-pleading materials are con-

sulted in determining the threshold jurisdictional issue. It is therefore not clear what distinction the *SCRAP* Court was drawing. What is clear is that under *either* Rule 12(b)(1) *or* Rule 56, a district court must give the plaintiff the opportunity to discover evidence relevant to his jurisdictional claim.

al notions of property rights. Pl.Br. at 36–41, Fed.Appellees Br. at 11–15, Calista Corp.Br. at 15–18, Alaska Br. at 34–38, Alaska Federation of Natives Br. at 29–38, Pl.Rep.Br. at 15–19. However, the likelihood of injury, whether or not that likelihood depends upon a single event or a chain of events, is properly a concern of the personal injury inquiry, not the causation inquiry (although whether *relief* is likely to follow remains, of course, a causation question). Thus, whether state or native ownership is more likely to injure plaintiffs than federal ownership is a factor to be taken into account when determining whether plaintiffs have made a sufficient showing of threatened personal injury.

 If plaintiffs do make such a showing, however, the causation question will properly concern only whether plaintiffs' injury at the hands of the state or the natives is dependent upon the new BLM policy, or is instead the result of independent incentives governing the state's or the

natives' decisionmaking process. We think the answer here is clear. Even though the state and the natives may have to take many factors into account in deciding what to do with newly acquired land, the new BLM policy that gave them legal ownership of that land in the first place will always be the primary factor enabling ultimate privatization. In other words, the natural consequence of a policy that transfers land ownership is to transfer the privileges that attend such ownership as well, which include, first and foremost, the power to control the use and enjoyment of land. Thus, any injury from impaired use and enjoyment of transferred land will be fairly traceable to the policy that triggered such a transfer. Similarly, a court order reinstating the old submerged lands chargeability policy would be likely to redress any injury to plaintiffs, because the land in question would no longer be available for state or native ownership and concomitant assertion of ownership rights.[11]

---

**11.** Although the District Court did not address the issue, plaintiffs must also pass the zone of interests test. Plaintiffs' cause of action derives from § 702 of the APA, which grants standing to a person "aggrieved by agency action within the meaning of a relevant statute." The Supreme Court has held that under § 702, in addition to showing personal injury, "the interest sought to be protected by the complainant [must be] arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Ass'n of Data Processing Serv. Orgs. v. Camp*, 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970). More recently, in *Clarke v. Securities Indus. Ass'n*, —— U.S. ——, 107 S.Ct. 750, 756, 93 L.Ed.2d 757 (1987), the Court interpreted § 702's "relevant statute" phrase broadly, permitting plaintiffs to allege a violation of one statute while relying upon a different law to pass the zone of interests test. *Clarke* adds that

> [t]he zone of interest test is a guide for deciding whether, in view of Congress' evident intent to make agency action presumptively reviewable, a particular plaintiff should be heard to complain of a particular agency decision. In cases where the plaintiff is not itself the subject of the contested regulatory action, the test denies a right of review if the plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit. The test is not meant to be especially demanding; in particular, there need be no

indication of congressional purpose to benefit the would-be plaintiff.

*Id.* at 757.

Under these precepts, plaintiffs would appear to pass the zone of interests test. By enacting ASA, Congress struck a purposeful balance between federal and state ownership of land in Alaska, evidencing its intent to retain that portion of Alaskan land in federal hands that was not otherwise lawfully conveyed to the state. ANCSA's legislative history clarifies as well that the settlement with the natives was intended to be "fair to the Natives, fair to the State of Alaska, and fair to all of the people of the United States." H.R.Rep. No. 523, 92nd Cong., 1st Sess. 5 (1971), *reprinted in* 1971 U.S.Code Cong. & Admin.News 2192, 2195. More specifically, ANCSA directed the Secretary to withdraw from public appropriation up to 80,000,-000 acres of public lands "deem[ed] ... suitable *for addition to or creation as units of the Na*tional Park, Forest, Wildlife Refuge, and Wild and Scenic Rivers Systems." 43 U.S.C. § 1616(d)(2)(A). Finally, ANILCA established the CSUs "to preserve for the benefit, use, education, and inspiration of present and future generations certain lands and waters in the State of Alaska that contain nationally significant natural, scenic, historic [and other] values...." 16 U.S.C. § 3101(a).

Thus, plaintiffs suing to protect their interests in enjoying the "natural, scenic, historic [and other] values" of the Alaskan wilderness appear to fall within the zone of interests of the statutory scheme represented by the three complementary enactments.

## III. OTHER CLAIMS

Apart from alleging that the challenged policy violates ASA and ANCSA, plaintiffs contend that BLM should have prepared an environmental impact statement (EIS), that BLM should have prepared an environmental assessment (EA) to determine whether to prepare an EIS, and that the decision regarding chargeability of submerged lands violated the APA because no opportunity for notice and comment was afforded interested members of the public. Additionally, plaintiffs challenge the District Court's denial of their motion to amend the complaint and their discovery requests.

### A. *NEPA Claims*

The District Court opinion addressed neither the merits of plaintiffs' National Environmental Policy Act (NEPA) claims (preparation of the EIS and EA) nor their standing to raise such claims. J.A. at 1–19. On remand, the District Court should address these issues.

### B. *APA Claim*

■ The District Court declined to reach the question of whether the absence of notice and comment procedures violated plaintiffs' rights under the APA,[12] because it did "not reach the merits of plaintiffs' substantive challenges to th[e] regulatory change." J.A. at 5–6 n. 7. Since plaintiffs lack standing to challenge BLM's substantive actions, they indeed lack standing to challenge procedural defects in the process that produced those actions. *See Capital Legal Foundation v. Commodity Credit Corporation,* 711 F.2d 253, 258–60 (D.C. Cir.1983) (mere assertion of procedural flaw in agency action unjusticiable absent allegation of personal injury stemming from that flaw). However, we note that plaintiffs may renew this claim if they can show personal injury sufficient for standing on remand.

### C. *Denial of Motion to Amend Complaint*

■ The District Court denied plaintiffs' motion to amend their complaint to "allege the violation of an additional statute, [ANILCA]." J.A. at 2 n. 2. The District Court explained that plaintiffs' motion occurred more than a year after the filing of their initial complaint and after dispositive motions had been filed and opposed. This action on the part of the District Court does not appear to be an abuse of discretion. We note, though, that some portions of ANILCA are relevant to this case even if plaintiffs are not permitted to claim its violation. *See* 43 U.S.C. § 1635(f) (providing for state overselection and prioritization); 43 U.S.C. § 1635(*o*) (determining the status of lands within CSUs); *see also* note 11, *supra* (ANILCA a "relevant statute" for zone of interests test).

### D. *Denial of Discovery Request*

■ The District Court granted defendants' motion for a protective order permitting them not to respond to plaintiffs' interrogatories and document production requests "until thirty days after this Court's ruling on defendants' Motion to Dismiss." Rec. No. 50, Order of April 12, 1985. The District Court later granted defendants' summary judgment motion, relying on extra-pleading materials in so doing. Plaintiffs' interrogatories and document requests were directly relevant to the stand-

---

**12.** Plaintiffs realize that BLM's procedure for changing the regulation regarding native selections differed from its procedure for changing the policy regarding state selections. With regard to the former, the initial notice of interim waiver of the old chargeability regulation was promulgated without notice and comment procedures but the final regulation was adopted only after such a procedure. Plaintiffs contend that "[t]his belated procedure could not cure the procedural defects of the interim waiver," but nonetheless they "now challenge only two procedural aspects of the amended regulation vis a vis the Natives—the inadequacy of public notice provided by the proposed rule and DOI's inadequate explanation of its reversal of policy." Pl.Br. at 56 n. 45.

As to the policy shift regarding state selections, the "establishment of policy" that accompanied the notice of interim waiver of the native regulation was the only action taken by BLM vis-a-vis the state. Plaintiffs continue to challenge this establishment of policy on the ground that it should have been preceded by a notice and comment period.

ing question on which summary judgment was granted and as to which we have found their claim lacking, *viz*, the specificity of the lands that will be affected by the new policy so as to cause them injury. For example, the document production request included

> [a]ll documents regarding the [CSU] classification of land that will be available for selection and/or conveyance by and to the natives and/or the [state] subsequent to the change in policy.

> All documents relating to the types of land (and especially their classification as [CSU] lands) that are located most closely to current native selections, and/or are of a similar character to the lands currently selected or owned by natives, and any other land most likely to be withdrawn by the Secretary of the Department of Interior for selection by the natives after the change in policy.

> All documents relating to the lands most likely to be selected by the natives and/or the [state] after the change in policy.

> All documents relating to the number of acres selected by 1) natives and 2) the [state] in [CSU] lands that exceed the natives' and the State's maximum acreage entitlements under [ANSCA] and [ASA], respectively.

Rec. No. 27, Request Nos. 9–11, 13, Plaintiffs' First Request for Production of Documents to Defendants Assistant Secretary and Secretary of the Interior, filed February 27, 1985. Plaintiffs' interrogatories similarly related to how the new policy will affect state and native land selections and conveyances:

> Identify as precisely as possible all [CSU] lands that are currently selected by but not conveyed to Alaska natives according to: a) geographic location; b) identity of selector; c) number of acres selected; d) [CSU] classification; e) potential for development; f) most probable type of development or use, other than subsistence; g) possible and/or probable adverse environmental impacts resulting from private ownership.... Include all lands conveyed to the natives since De-

cember 5, 1983, under the change in policy.

> Identify as precisely as possible all [CSU] lands that are currently selected by but not conveyed to the [state], according to the subcategories set out in [the just-quoted interrogatory]. Include all lands conveyed to the State since December 5, 1983, under the change in policy.

Rec. No. 28, Interrogatory Nos. 7–8, Plaintiffs' First Interrogatories to Defendants Assistant Secretary and Secretary of the Interior, filed February 27, 1985.

The Supreme Court's requirement of a high level of specificity in personal injury cases is generally made in the context of a process in which plaintiffs can make the required showing through discovery. *See United States v. SCRAP,* 412 U.S. 669, 689–90 n. 15, 93 S.Ct. 2405, 2417 n. 15, 37 L.Ed.2d 254 (1973); *Williamson v. Tucker,* 645 F.2d 404, 414 (5th Cir.1981). When review of plaintiff's standing claim is restricted to the pleadings, the Court has required a less specific showing. *See SCRAP,* 412 U.S. at 689–90, 93 S.Ct. at 2416–17. To subject plaintiffs to a more stringent review, as the District Court here did, while at the same time denying their discovery requests for the very materials that might enable them to satisfy that more stringent review, amounts to an abuse of discretion. Accordingly, we hold that plaintiffs should have been permitted to seek discovery pertaining to more specific information about the lands that will be affected by the new policy.

## IV. Conclusion

In sum, we hold that on the current record plaintiffs do not have standing to raise their ASA, ANCSA, and APA challenges, and that the District Court did not abuse its discretion in denying plaintiffs' motion to amend their complaint. We also hold that the District Court erred in not allowing plaintiffs discovery pertaining to the effect of the new policy on specific lands, and that the District Court should consider plaintiffs' NEPA claims on re-

mand. Accordingly, the judgment of the District Court is

*Affirmed in part, reversed and remanded in part for further proceedings not inconsistent with this opinion.*