NATIONAL WILDLIFE FEDERATION, Appellant,

v.

Robert F. BURFORD, et al.

NATIONAL WILDLIFE FEDERATION

v.

Robert F. BURFORD, et al.

Appeal of ASARCO INCORPORATED, Applicant for Intervention.

Nos. 88–5397, 88–5291.

United States Court of Appeals, District of Columbia Circuit.

Argued March 21, 1989.

Decided June 20, 1989.

---

Eldon V.C. Greenberg, with whom Kathleen C. Zimmerman and Norman L. Dean, Jr., Washington, D.C., were on the brief, for appellant in No. 88–5397.

Jacques B. Gelin, Atty., Dept. of Justice, Washington, D.C., with whom Donald A. Carr, Acting Asst. Atty. Gen., Robert L. Klarquist and Fred R. Disheroon, Attys., Dept. of Justice, Washington, D.C., were on the brief, for appellees in No. 88–5397.

Jerry L. Haggard, Phoenix, Ariz., of the bar of Arizona, pro hac vice, by special leave of Court, with whom Nancy C. Shea, Washington, D.C., and H. Barry Holt, Phoenix, Ariz., were on the brief, for appellants in No. 88–5291.

Kathleen C. Zimmerman, Washington, D.C., for appellee in No. 88–5291.

Eric Twelker, Denver, Colo., also entered an appearance for appellees, in No. 88–5397.

Bruce J. Ennis, David W. Ogden and David A. Handzo, Washington, D.C., were on the brief of amicus curiae The Wilderness Soc. urging reversal, in No. 88–5397.

Before EDWARDS and RUTH BADER GINSBURG, Circuit Judges, and KAUFMAN,* Senior Judge.

Opinion for the Court filed by Circuit Judge HARRY T. EDWARDS.

HARRY T. EDWARDS, Circuit Judge:

In July 1985, appellant National Wildlife Federation ("NWF" or "Federation"), a nonprofit natural resources conservation and education association with over 4.5 million members, brought suit to challenge a Department of Interior ("Interior" or "Department") decision to reclassify the status of approximately 180 million acres of public land. The present appeals involve two decisions arising out of NWF's suit. First, on November 4, 1988—after extended preliminary proceedings, including the issuance of a preliminary injunction enjoining Interior's challenged activity, which was upheld by this court in *National Wildlife Federation v. Burford,* ("*Burford I*"), 835 F.2d 305 (D.C.Cir.1987), and various actions by the trial court amending the original injunction—the District Court granted Interior's motion for summary judgment on the ground that NWF lacked standing. NWF now appeals from that decision. Second, ASARCO, Inc. ("ASARCO"), a producer of nonferrous metals, appeals the District Court's denial of its motion to intervene. The District Court so

---

* Of the United States District Court for the District of Maryland, sitting by designation pursuant to 28 U.S.C. § 294(d).

ruled because it found ASARCO's motion to be untimely filed.[1]

On the first appeal, No. 88–5397, we adhere to the holding of the court in *Burford I* that NWF "has alleged injury in fact sufficient to establish standing to pursue its ... claims against the Department," 835 F.2d at 314, and we conclude that the record before us is more than adequate to allow NWF to survive a motion for summary judgment on standing. Therefore, we reverse the judgment of the District Court and remand for a determination on the merits.[2]

On the second appeal, No. 88–5291, we reverse the District Court's denial of AS-ARCO's motion to intervene with respect to one of ASARCO's claims, because we find that the motion was timely filed. We remand this portion of the case to the District Court to allow it to consider whether ASARCO's intervention is presently warranted.

## I. BACKGROUND

### A. *Standing of the National Wildlife Federation*

NWF filed suit under the Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. §§ 1701 *et seq.* (1982); the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. §§ 4321 *et seq.* (1982); and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551 *et seq.* (1982), challenging Interior's ongoing "Land Withdrawal Review Program" ("Program"). The Program primarily involves the termination of land "withdrawals" and "classifications," the two main vehicles through which Interior establishes and implements land use planning for millions of acres of federal public lands. "Classifications" al-

low Interior to categorize lands for specific usage, and frequently designate public lands for retention, thereby segregating them from the scope of various land disposal laws. "Withdrawals" directly remove designated public lands from disposal under the general land laws. The Program is implemented by the Bureau of Land Management ("BLM"), a subagency of Interior.

Pursuant to the Program, the Department, relying on its authority under the FLPMA,[3] lifted protective restrictions from nearly 180 million acres of federal land located in seventeen states. According to the Assistant Director of Land Resources for the BLM, over thirteen million acres of public lands that previously were closed to some or all types of mining are now open to be mined by private parties as a result of these classification and withdrawal terminations, *see* Affidavits of BLM Assistant Director Frank Edwards, Joint Appendix ("J.A.") 75, 102–03, and another eight million acres are now open for mineral leasing, *Burford I*, 835 F.2d at 324–25. Hundreds of leases and sales have already been effectuated or are pending for mining, mineral leasing, agricultural, commercial, and other proposed developmental uses. *See id.*

NWF filed suit challenging the Program on July 15, 1985, simultaneously moving for preliminary injunctive relief. On December 4, 1985, the District Court granted NWF's motion for a preliminary injunction, enjoining Interior from issuing any new "withdrawal revocations" or "classification terminations" and from engaging in any activities inconsistent with extant withdrawals and terminations. *National Wildlife Federation v. Burford*, 676 F.Supp.

---

**1.** These cases were argued separately before this court. NWF's appeal was docketed as case No. 88–5397, and ASARCO's as No. 88–5291. We have consolidated the two cases for decision because of the unity of the substantive issues underlying these procedural appeals.

**2.** We find it unnecessary to reinstate the preliminary injunction because the case should now proceed directly to the merits.

**3.** Until enactment of the FLPMA, terminations of classifications and withdrawals could be effected only by the President. However, in 1976, Congress enacted FLPMA § 202(d), 43 U.S.C. § 1712(d) (1982), which authorized the BLM to modify or terminate its previous classifications and withdrawals. The Program was thus enacted pursuant to the FLPMA and is subject to that statute's other substantive management criteria. *See, e.g., id.* §§ 1701, 1712, 1714.

271 (D.D.C.1985).[4]

On December 11, 1987, a panel of this court affirmed the District Court's grant of preliminary relief. *See Burford I, supra.* This court first addressed preliminary matters such as standing, the effect on absent third parties, and exhaustion, *see* 835 F.2d at 310–18, and concluded "that the Federation has alleged facts that demonstrate that the actions of the Department threaten to harm the cognizable interests of the Federation's members. Consequently, we find that the Federation has alleged injury in fact sufficient to establish standing to pursue its two FLPMA claims against the Department." *Id.* at 314. Passing to the merits, the court in *Burford I* held that the Federation had satisfied the burden of proof necessary to sustain a preliminary injunction. Conceding that this was a "close" case, *id.* at 319, the court nevertheless held that the District Court had not abused its discretion in finding that NWF had shown a likelihood of success on the merits, *see id.* at 327.[5]

Following this court's remand in *Burford I,* and during subsequent pre-trial proceedings before the District Court, NWF complained of the same specific injury from the Program's reclassifications that it had cited in its motion for the preliminary injunction. First, NWF claimed that its many members who "use and enjoy the environmental resources that will be adversely affected by the challenged actions" would be deprived of such use by the development of these lands. Brief for Appellant NWF at 10. Second, NWF complained that the organization and its members had been injured by being denied "information on the potential impacts of defendants' actions" as well as "the opportunity to participate in defendants' decision-making." *Id.*

In support of these complaints, NWF resubmitted to the trial court the affidavits of two of its members, Peggy K. Peterson, *see* J.A. 209, and Richard L. Erman, *see* J.A. 205, and the sworn declaration of its Vice–President for Resources Conservation, Lynn A. Greenwalt, *see* J.A. 212. Two of these same affidavits had been ruled sufficient to establish standing for the purposes of a preliminary injunction by both the District Court itself and by this court in *Burford I.*

Both sides moved for summary judgment; the matter was extensively briefed and oral argument was heard on the motions on July 22, 1988. After oral argument, the District Court directed both sides to submit additional memoranda by August 22, 1988, on the issue of NWF's standing to bring suit. Both parties complied with this order, but the trial court then declined to consider certain of the additional material submitted by the Federation. The court stated that it found these submissions, which included "declarations from four of its members," to be "evidentiary material," submitted "in addition to [NWF's] memorandum filed August 22, 1988." Because it found these submissions to be "untimely and in violation of our Order," it "decline[d] to consider them." *National Wildlife Federation v. Burford,* 699 F.Supp. 327 (1988), *reprinted in* J.A. 367, 370 n. 3 [hereinafter "Memorandum Opinion"].

In the same Memorandum Opinion, issued on November 4, 1988, the District Court also dismissed the case for lack of standing and lifted the preliminary injunction. The court acknowledged that NWF had established standing in the prior proceedings before the court of appeals because "the issue of standing arose in the posture of defendant's motion to dismiss."

---

4. On February 10, 1986, pursuant to the defendants' motion to clarify, the District Court modified the injunction to make clear that it reached only the federal defendants and not absent third parties, and that it was not intended "to overturn or in any way to upset fee interests." *National Wildlife Federation v. Burford,* 676 F.Supp. 280, 284 (D.D.C.1986). The original injunction was subsequently amended three more times prior to this appeal to further limit the reach of the injunction.

5. Subsequently, in the course of denying another motion, a panel of this court exhorted the District Court to proceed with the litigation "with dispatch" because millions of acres of land were "on hold" due to a preliminary injunction issued only on the basis of brief affidavits and other cursory materials, *see National Wildlife Federation v. Burford,* 844 F.2d 889, 890 (D.C.Cir.1988) (per curiam).

Memorandum Opinion, J.A. 370. On a motion to dismiss, the trial court reasoned, an appellate court had to assume the complaint's allegations to be true and had to construe them in a light most favorable to the organization. *See id.* (citing *Burford I,* 835 F.2d at 312; *Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975)). The District Court opined that Supreme Court and subsequent D.C. Circuit precedent mandated that more specific injury-in-fact must be shown to sustain standing on a motion for summary judgment than to sustain standing on a motion to dismiss. *See* Memorandum Opinion, J.A. 370–71 (citing *United States v. Students Challenging Regulatory Agency Procedures ("SCRAP"),* 412 U.S. 669, 689 & n. 15, 93 S.Ct. 2405, 2417 & n. 15, 37 L.Ed.2d 254 (1973)); *Wilderness Society v. Griles,* 824 F.2d 4, 16–17 (D.C.Cir.1987). The trial court, however, failed to give due weight to the fact that the panel in *Burford I* held that NWF had established standing for purposes of a preliminary injunction, and not merely to survive a motion to dismiss.

Reconsidering its initial finding of standing in light of what it saw as this more demanding *SCRAP/Griles* standard, the trial court concluded that the affidavits submitted by NWF were insufficient evidence of injury-in-fact to sustain standing. The court rejected the affidavit of NWF Vice–President Greenwalt as "conclusory and completely devoid of specific facts." Memorandum Opinion, J.A. 374. Turning to the Peterson and Erman affidavits, the court noted that these presented the issue of so-called "third-party" injury—that is, injury to the plaintiff that is caused by the future conduct of a third party (in this case, a mining company), in response to defendant's action, rather than by the direct action of the defendant. The court therefore defined the standing issue as "whether the plaintiff has put forward enough facts to show that his intended behavior will be injured as a direct or indirect result of the challenged governmental action." *Id.,* J.A. 375 (quoting *Griles,* 824 F.2d at 12). The trial court concluded that

the Peterson and Erman affidavits were "vague, conclusory and lack[ed] [the] factual specificity.... [to] show 'injury in fact.'" *Id.,* J.A. 378. Specifically, the court found that, because Peterson claimed only that she uses lands "in the vicinity" of the South Pass–Green Mountain area of Wyoming for recreation, the affidavit was not specific enough to show that her use and enjoyment extended to the *particular* 4500 acres that would be affected by the challenged Department termination within the described two million acre area. The court found the Erman affidavit to be "similarly flawed" with respect to the Arizona lands it addressed. *See id.,* J.A. 377. This appeal followed.

### B. *ASARCO's Motion to Intervene*

Under one classification that the Program terminated, 31,000 acres of federal land in central Oregon were withdrawn from private appropriation, including the location of mining claims. Pursuant to this classification termination, the BLM permitted ASARCO, whose business includes the exploration and development of mineral interests through mining claims on federal lands throughout the western United States, to stake mining claims on some of these lands from November 1987 through January 1988. These claims are known as the "Spanish Gulch" claims. However, because of the order of the District Court enjoining the post–1981 terminations, the BLM subsequently notified ASARCO by letter dated March 21, 1988, that its Spanish Gulch claims were null and void. The letter explained that as of February 10, 1986, and continuing until the injunction was lifted or modified, the BLM could not open the Spanish Gulch lands to private mining claims. *See* ASARCO Appendix ("A.A.") 30–31.

On June 6, 1988, ASARCO moved to intervene as a defendant in the NWF action.[6] ASARCO maintained that the scope of NWF's complaint and the application of the preliminary injunction did not extend to some interests in federal land, including

---

**6.** ASARCO also appealed the BLM's determination to the Interior Board of Land Appeals.

ASARCO's Spanish Gulch claims.[7] Although ASARCO's motion to intervene was filed three years after the filing of NWF's original suit, and two-and-a-half years after the issuance of the District Court's preliminary injunction, it was filed less than three months after ASARCO was notified by Interior that its Spanish Gulch claims were directly affected by this litigation.

On July 22, 1988, the same day the District Court heard oral argument on the cross-motions for summary judgment in the ongoing NWF suit against the Government, the trial court also denied ASARCO's motion to intervene "into this longstanding litigation," stating that the motion was untimely under Rule 24 of the Federal Rules of Civil Procedure.[8] *See National Wildlife Federation v. Burford*, No. 85–2238 (D.D.C. July 22, 1988), *reprinted in* A.A. 39. As noted above, the District Court subsequently dismissed the Federation's case for lack of standing and simultaneously dissolved the preliminary injunction from which ASARCO claimed injury. ASARCO appealed, subject to this court's disposition of NWF's appeal in the primary case.

## II. ANALYSIS

### A. *Standing of the National Wildlife Federation*

It is well settled that an organization may have standing to bring suit on behalf of its members. *See International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America*

*v. Brock ("UAW v. Brock")*, 477 U.S. 274, 281–90, 106 S.Ct. 2523, 2528–29, 91 L.Ed.2d 228 (1986); *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977). In *Hunt*, the Supreme Court determined that an organization seeking to pursue members' claims in a representational capacity may do so if

> (a) [one or more of the organization's] members would otherwise have standing to sue in their own right; (b) the interests [the organization] seeks to protect are germane to the organization's purposes; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

432 U.S. at 343, 97 S.Ct. at 2441. *See also Burford I*, 835 F.2d at 311. At issue in the instant case is only the first of the *Hunt* factors; no one disputes that the last two requirements have been met.[9] Thus, the crux of the standing issue in this case is whether Federation members would have standing to sue in their own right.

Article III of the Constitution limits the rights of individuals to seek judicial redress by extending the "judicial power" of the United States only to the resolution of "cases" and "controversies." U.S. CONST. art. III, § 2. In *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982), the Supreme Court de-

---

**7.** ASARCO based this argument on the fact that some land classifications, including the Spanish Gulch claims, had already terminated by operation of law well before 1981, under the now-expired Classification and Multiple Use Act of 1964, so that the preliminary injunction could not encompass these terminations.

**8.** ASARCO sought a stay of the District Court's order pending its appeal. By order dated September 6, 1988, the District Court denied the stay, finding that ASARCO's then-asserted interests were already adequately represented by existing parties to the litigation, that the motion to intervene was untimely, and that further postponement of the case "would be harmful to the parties and the public." *National Wildlife Federation v. Burford*, No. 85–2238, slip op. at 2 (D.D.C. Sept. 6, 1988).

**9.** To wit, first, NWF seeks to protect its members' interests in preserving the environmental resources that will be adversely affected by the Interior action. These interests are germane to NWF's purposes, which include natural resource preservation and conservation. Second, there is no reason to require individual Federation members to participate in this case. Courts have generally required individual participation only when there are conflicts of interest within an organization, *see, e.g., Harris v. McRae*, 448 U.S. 297, 320–21, 100 S.Ct. 2671, 2689–90, 65 L.Ed.2d 784 (1980), or when individual participation in a suit is needed in order to make damage determinations, *see, e.g., Warth*, 422 U.S. at 515–16, 95 S.Ct. at 2213–14.

scribed the scope of these limitations as follows:

[A]t an irreducible minimum, Art. III requires the party who invokes the court's authority to "show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant," *Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 99, 99 S.Ct. 1601, 1608, 60 L.Ed.2d 66 (1979), and that the injury "fairly can be traced to the challenged action" and "is likely to be redressed by a favorable decision," *Simon v. Eastern Kentucky Welfare Rights Org.,* 426 U.S. 26, 38, 41, 96 S.Ct. 1917, 1925, 48 L.Ed.2d 450 (1976).

Of these three constitutional standing components—injury-in-fact, causation, and redressibility—the District Court in the case before us rested its denial of standing only on the first. It found that NWF had not demonstrated the requisite injury-in-fact, because NWF's affidavits did not evidence a particular showing of injury. We disagree and reverse this finding.[10]

### 1. Injury-in-Fact

■ NWF claims it is entitled to judicial review under section 10(a) of the APA, 5 U.S.C. § 702 (1982).[11] Injury-in-fact analysis under the APA mirrors that required by the Constitution. *See Community for Creative Non-Violence v. Pierce,* 814 F.2d 663, 667 (D.C.Cir.1987). This injury-in-fact requirement is satisfied by the presence of a "distinct and palpable injury." *Warth,* 422 U.S. at 501, 95 S.Ct. at 2206; *see also Center for Auto Safety v. National Highway Traffic Safety Admin.,* 793 F.2d 1322,

---

**10.** Defendant-intervenor Mountain States Legal Foundation ("Mountain States") raises several other challenges to NWF's standing in addition to the injury-in-fact challenge. These involve the causation and redressibility requirements for constitutional standing, and the prudential "generalized grievance" limitation on standing—*i.e.,* that the injury must not be a generalized grievance about the conduct of government, since these are most appropriately addressed in the representative branches. *Warth,* 422 U.S. at 499–500, 95 S.Ct. at 2205; *Center for Auto Safety v. National Highways Traffic Safety Admin.,* 793 F.2d 1322, 1335 (D.C.Cir.1986). We reject these other standing claims.

To begin with, there is no doubt that any injury alleged by NWF is caused by, and could be easily redressed by, the Department's modification of its plans under the Program. Mountain States argues that the injury to NWF members will not be caused directly by the Government but, rather, by mining and other development companies affected by regulations under the Program. Therefore, according to Mountain States, because NWF has not alleged facts sufficient to identify any adverse action that will be taken by these companies, plaintiff's injury is not "fairly traceable" to that action, nor is it "likely to be redressed" by an order binding the Government. It is understandable why neither the District Court in its decision below nor the Government on this appeal endorses Mountain States' position, for it is patently flawed.

Once the lands in dispute are removed from Government regulation or protection under the Program, and made available for private mining and other developmental uses, NWF will have no claim against those in control of the land development projects. Furthermore, to the extent that evidence regarding private developmental uses is relevant, it has already been addressed by this court in *Burford I.* Based on both the challenged NWF affidavits and the sworn statements of Government officials delineating the precise scope of pending third-party activity in response to the Program, this court specifically rejected the argument now advanced by Mountain States. *See Burford I,* 835 F.2d at 313–14, 324–25. The relevant portion of that opinion has not been called into question or resisted in any way by any litigant. The intervenor has offered no valid basis for reconsideration of our earlier rejection of this argument, and the Government has not even seen fit to raise the issue. Intervenor's position obviously lacks any merit, and we accordingly reject it.

Nor do we find any merit in the intervenor's claims that the Federation should be denied standing under the prudential "generalized grievance" principle. It is plain in this case that NWF has not based its claim on any generalized grievance about the Government's activities, but rather on the concrete injury to its members. The Supreme Court has "made it clear that standing is not to be denied simply because many people suffer the same injury." *SCRAP,* 412 U.S. at 687, 93 S.Ct. at 2416. As long as there is a "logical nexus between the status asserted and the claim sought to be adjudicated," *Flast v. Cohen,* 392 U.S. 83, 102, 88 S.Ct. 1942, 1953, 20 L.Ed.2d 947 (1968), plaintiffs will have met the "generalized grievance" criteria. We find that, on the facts of this case, NWF has alleged such a "logical nexus."

**11.** Section 702 gives the right of judicial review to a "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute."

1331 (D.C.Cir.1986). The injury may result from invasion of a statutory right as well as a constitutional one, *see, e.g., Schlesinger v. Reservists Comm. to Stop The War*, 418 U.S. 208, 224 n. 14, 94 S.Ct. 2925, 2934 n. 14, 41 L.Ed.2d 706 (1974); *Sierra Club v. Morton*, 405 U.S. 727, 732 & n. 3, 92 S.Ct. 1361, 1365 & n. 3, 31 L.Ed.2d 636 (1972), but it must be more than merely "abstract" or "conjectural" to suffice, *Allen v. Wright*, 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984). The injury need not be important or large; an "identifiable trifle" can meet the constitutional minimum. *SCRAP*, 412 U.S. at 689 n. 14, 93 S.Ct. at 2417 n. 14. "And an injury shared by a large number of people is nonetheless an injury." *Center for Auto Safety*, 793 F.2d at 1331 (citing *Sierra Club*, 405 U.S. at 734, 92 S.Ct. at 1366).

Elaborating on the injury-in-fact standard, the *Burford I* court explained that "[t]he Federation must allege facts demonstrating a definable and discernible injury to its members and an adequate connection between that injury and the members. *See* [*SCRAP*, 412 U.S. at 688–89, 93 S.Ct. at 2416]. The personal injury may be 'actual or threatened.' [*Valley Forge*, 454 U.S. at 472, 102 S.Ct. at 758]." 835 F.2d at 311. The *Burford I* court then analyzed "a pair of environmental lawsuits relevant to this case," *id.*, handed down by the Supreme Court that elaborate on the requirement in this context. In *Sierra Club*, the Court denied standing to the Sierra Club on its allegation that the Government's decision to permit development of a quasi-wilderness national park would "destroy or ... adversely affect" the natural resources in the park and would "impair ... enjoyment ... for future generations." 405 U.S. at 734, 92 S.Ct. at 1366. Although acknowledging that this was a cognizable injury, the Court nonetheless found that it did not amount to injury-in-fact sufficient to uphold standing because the Sierra Club had "failed to allege that it or its members would be affected in any of their activities or pastimes by the ... development." *Id.*

at 735, 92 S.Ct. at 1366. In contrast, the Court found in *SCRAP* that the plaintiff-organization had established standing to challenge an ICC rate increase. No doubt tailoring its complaint to conform with the decision in *Sierra Club*, the *SCRAP* plaintiffs had alleged that their members used "the forests, rivers, streams, mountains, and other natural resources surrounding the Washington Metropolitan area" for various recreational and aesthetic purposes, and that these uses would be disturbed by a chain of third-party responses to the challenged agency action. *SCRAP*, 412 U.S. at 678, 93 S.Ct. at 2411. The *Burford I* court summarized the teachings of these cases as making "clear that in order to establish injury in fact for representational standing, an organization must allege facts showing that one or more of its members is among the persons injured by the challenged agency action." 835 F.2d at 311.

 The affidavits submitted by the Federation in this case clearly alleged facts showing that its members were "among the persons injured" by Interior. Thus, we hold that in this case as pleaded on July 22, 1988, *i.e.*, at the time of the District Court's hearing on the cross-motions for summary judgment, NWF demonstrated sufficient detail of injury-in-fact to survive a motion for summary judgment on standing grounds. In other words, even leaving aside the applicable law of the case established by this court in *Burford I*, *see* Part II.A.2 *infra*, and the supplemental affidavits submitted by petitioners after the hearing on the motions for summary judgment, *see* Part II.A.3 *infra*, there was enough detail in support of standing to raise material issues of fact sufficient to require the trial judge to consider the case on the merits. In fact, the original Peterson affidavit alone raised "genuine issue[s] [of] material fact," FED.R.CIV.P. 56(c), with respect to the standing issue, enabling petitioners to survive a motion for summary judgment.[12]

Peterson's affidavit stated:

> standing alone, the [Peterson and Erman] affidavits do not provide any basis for standing

---

**12.** As a preliminary matter, we note the District Court's finding that

My recreational use and aesthetic enjoyment of federal lands, particularly those in the vicinity of South Pass–Green Mountain, Wyoming have been and continue to be adversely affected in fact by the unlawful actions of the Bureau and the Department. In particular, the South Pass–Green Mountain area of Wyoming has been opened up to the staking of mining claims and oil and gas leasing, an action which threatens the aesthetic beauty and wildlife habitat potential of these lands.

J.A. 210. The District Court found this statement not to be specific enough because the Interior

decision [to open the South Pass–Green Mountain area of Wyoming to mining claims and oil and gas leasing] opened up to mining approximately 4500 acres within a two million acre area, the balance of which, with the exception of 2000 acres, has always been open to mineral leasing and mining.... There is no showing that Peterson's recreational use and enjoyment extends to the particular 4500 acres covered by the decision to terminate classification.

Memorandum Opinion, J.A. 376–77.

On the record of this case, the trial court's reasoning does not support the result reached. Interior planned to open to leasing all but 2000 of the remaining unleased 6500 acres in a two million acre area. The language of Peterson's affidavit can be read to *presume* that the 4500 newly opened acres included the areas that Peterson uses; otherwise, *her* use and enjoyment would *not* be "adversely affected" in any way. In other words, the universe of the land to which Peterson's affidavit refers can only encompass the 6500 acres

to challenge, as violative of the Federal Land Policy Management Act, the legality of *each* of the 1250 or so individual classification terminations and withdrawal revocations. J.A. 378 (emphasis added). As we stated in *Burford I, see* 835 F.2d at 324, to the extent that this summarizes the trial court's reasoning, it reflects an erroneous application of law. The applicable law governing standing requires that plaintiffs be injured by only *one* of the terminations. *See UAW v. Brock*, 477 U.S. at 282–86, 106 S.Ct. at 2529–31; *Warth*, 422 U.S. at 511, 95 S.Ct. at 2211.

that was not yet opened to mining and leasing claims. Of these 6500 acres, only 4500 are affected by the Program. If Peterson was not referring to lands in this 4500–acre affected area, her allegation of impairment to her use and enjoyment would be meaningless, or perjurious. The District Court in no way questions the *veracity* or *clarity* of the affidavit, only its *specificity. Cf. SCRAP*, 412 U.S. at 689, 93 S.Ct. at 2416 (court will not consider whether allegations in affidavits are untrue unless alleged by opposing party). But the trial court overlooks the fact that unless Peterson's language is read to refer to the lands affected by the Program, the affidavit is, at best, a meaningless document.

At a minimum, Peterson's affidavit is ambiguous regarding whether the adversely affected lands are the ones she uses. When presented with ambiguity on a motion for summary judgment, a District Court must resolve any factual issues of controversy in favor of the non-moving party, even when the issue of harm and the issue on the merits are intertwined. *See Better Gov't Ass'n v. Department of State*, 780 F.2d 86, 94 (D.C.Cir.1986); *International Ladies' Garment Workers' Union v. Donovan*, 722 F.2d 795, 810 (D.C. Cir.1983); *accord National Wildlife Federation v. Snow*, 561 F.2d 227, 236–37 (D.C.Cir.1976). This means that the District Court was obliged to resolve any factual ambiguity in favor of NWF, and would have had to assume, for the purposes of summary judgment, that Peterson used the 4500 affected acres. Accordingly, we find that Peterson has alleged injury-in-fact sufficient to give her standing to sue, and therefore that NWF also has standing under the *Hunt* criteria.[13]

13. Because we find the Peterson affidavit to be adequate support for the standing claim, it is unnecessary for us to decide whether the Erman and Greenwalt affidavits, both of which differ somewhat from Peterson's, are specific enough to merit standing. *See Sierra Club*, 405 U.S. at 740 n. 15, 92 S.Ct. at 1369 n. 15, ("The test of injury in fact goes only to the question of standing to obtain judicial review"; once standing is established, "the party may assert the interests of the general public in support of his claims for

## 2. The Law of the Case

■ Furthermore, and equally importantly, our decision on this appeal is precisely in accord with what another panel of this court found the first time this case was heard on appeal in *Burford I.* The *Burford I* court held that "the affidavits supplied by the Federation specifically identify locations where its members' interests are threatened by the Department's actions in lifting restrictions on mining and other forms of natural resource exploitation." 835 F.2d at 325. The affidavits referred to by the court are the *very same* ones that we now review; the *Burford I* court expressly held they provided adequate grounds for NWF to establish irreparable harm at the preliminary injunction stage. Even Judge Williams, concurring in part and dissenting in part from *Burford I,* agreed that the record established NWF's standing, albeit "minimally." 835 F.2d at 329–30. For another panel of this court subsequently to contradict this express finding when circumstances have not changed would contravene the law of the case. *See* 1B MOORE'S FEDERAL PRACTICE ¶ 0.404[1] at 119 ("[w]hen a case is appealed and remanded, the decision of the appellate court establishes the law of the case and it *must* be followed by the trial court on remand") (emphasis in original); *Doe v. New York City Dep't of Social Serv.,* 709 F.2d 782, 788–89 (2d Cir.), *cert. denied,* 464 U.S. 864, 104 S.Ct. 195, 78 L.Ed.2d 171 (1983).

We recognize that *Burford I* analyzed the showing necessary to survive a challenge to standing on a motion to dismiss, which was the posture of this case when it was first appealed. The Government now argues that, because the majority opinion in *Burford I* discussed standing in connection with a motion to dismiss, 835 F.2d at 312, the court never confronted the *Griles* test, which sets a somewhat higher standard for obtaining standing on a motion for summary judgment than on a motion to dismiss. *See Griles,* 824 F.2d at 16 ("[W]hile a motion to dismiss may be decided on the pleadings alone, construed liberally in favor of the plaintiff, a motion for summary judgment by definition entails an opportunity for a supplementation of the record, and accordingly a greater showing is demanded of the plaintiff."). However, what is critical for purposes of review here is that the court in *Burford I* also found standing to support the District Court's grant of a preliminary injunction in favor of petitioners.

The Government's argument completely fails to recognize that, in this case, the burden of establishing irreparable harm to support a request for a *preliminary injunction* is, if anything, *at least as great* as the burden of resisting a *summary judgment motion* on the ground that the plaintiff cannot demonstrate "injury-in-fact." To obtain a preliminary injunction, NWF not only had to demonstrate specific harm, but also carry the *burden of persuasion,* showing a likelihood of success on the merits. On a motion for summary judgment, a plaintiff need only create a jury issue.

When the *Burford I* court found standing to support a preliminary injunction, it also found sufficient injury-in-fact to support the test of standing under *Griles.* As Judge Williams' separate opinion states, *"the specificity required for standing allegations to secure a preliminary injunction will normally be no less than that required on a motion for summary judgment."* 835 F.2d at 328 (emphasis added). To the extent that *Griles* requires a higher degree of specificity to show injury-in-fact for standing at the summary judgment stage than would be required on a motion to dismiss, the court in *Burford I* found this burden to be met in upholding petitioners' standing to secure a preliminary injunction. The *Burford I* decision uphold-

equitable relief."); *Sierra Club v. Adams,* 578 F.2d 389, 392 (D.C.Cir.1978).

We only note here that the *Burford I* court found that the Federation had demonstrated injury-in-fact based on both the Erman and Peterson affidavits. *Burford I,* 835 F.2d at 314;

*see also id.* at 329–30 (Williams, J., concurring and dissenting in part) (noting that intervenor Mountain States conceded in oral argument that "some of the acreage opened to mining was in the vicinity of lands used by [Erman] in Arizona"). *See also* Part II.A.2 *infra.*

ing petitioners' standing is therefore the law of the case, which disposes of this appeal.

### 3. The Supplemental Affidavits

■ Because *Burford I* expressly found that petitioners had satisfied the standing requirements, there was no reason for petitioners to suspect that there remained any standing question on remand. If the District Court felt that the standing question was still open, or that more information was required to assess the issue, then it could have permitted petitioners to supplement the record. *See Griles*, 824 F.2d at 17 n. 10 ("a district court can assure that appropriate extra-pleading materials are consulted in determining the threshold jurisdictional issue"). The law of this circuit allows plaintiffs to supplement the record to cure alleged defects on standing. *See, e.g.*, *National Wildlife Federation v. Hodel*, 839 F.2d 694, 703 (D.C.Cir.1988). The equities of this case unquestionably compel such an allowance: the papers on which the trial court relied were two years old by the time it requested supplemental memoranda on the standing issue, and there was no indication prior to the trial court's request that NWF should have doubted the adequacy of the affidavits it had already submitted. Moreover, appellees had full opportunity to refute the evidence in these affidavits; the District Court had specifically given appellees ten days to file "any opposition" to NWF's supplemental memorandum. J.A. 345. In this context, we find that it was unfair and an abuse of discretion for the trial court to refuse to consider the affidavits submitted by NWF when the court asked for supplemental memoranda on the standing issue.

No party to this litigation seriously disputes that NWF's supplemental affidavits, if considered, easily satisfy the level of specificity needed for standing under any of the Supreme Court's articulated tests. Thus, even if the original affidavits were insufficient, and even if we assume that this court's decision in *Burford I* did not decide the issue, these supplemental affidavits offer enough detail to establish NWF's standing.[14]

### B. *ASARCO's Motion to Intervene*

■ The District Court found ASARCO's intervention claim to be untimely under Rule 24(a) of the Federal Rules of Civil Procedure, which provides that a party may intervene as a matter of right if, *inter alia*, the motion to intervene is timely filed.[15] We disagree with the trial court's finding only with respect to the Spanish Gulch claims, for ASARCO acted promptly to intervene in the suit as soon as the BLM construed the District Court's preliminary injunction order to invalidate these claims. However, we agree with the District Court on ASARCO's other, more general claims.

The timeliness of a motion to intervene does not depend solely on "the amount of time which has elapsed since the litigation began [but] ... also [on] ... the related circumstances, including the purpose for which intervention is sought ... and the improbability of prejudice to those already parties in the case." *Hodgson v. United Mine Workers of America*, 473 F.2d 118, 129 (D.C.Cir.1972); *see also NAACP v. New York*, 413 U.S. 345, 366, 93 S.Ct. 2591, 2603, 37 L.Ed.2d 648 (1973) (whether a motion to intervene is timely "is to be determined from all the circumstances"); *Natural Resources Defense Council v. Costle*, 561 F.2d 904, 907 (D.C.Cir.1977).

In this case, the salient factor is not when ASARCO's motion to intervene was filed with respect to the filing of NWF's original suit, or even with respect to the District Court's issuance of the preliminary

---

**14.** In light of our decision that the Federation has standing to sue in its own right, it is unnecessary to consider whether plaintiff-intervenor Congressman Bruce Vento also has standing, or whether his standing claims are interdependent with those of the Federation in any way. Congressman Vento has separately appealed the dismissal of his case.

**15.** FED.R.CIV.P. 24(a)(2) also requires that the applicant must claim an interest relating to the property that is the subject of the action; must show that the judicial disposition of the action may impair or impede the applicant's ability to protect its interest; and must show that the applicant's interests are not adequately represented by existing parties.

injunction. Rather, the relevant time from which to assess ASARCO's right of intervention is when ASARCO knew or should have known that any of its rights would be directly affected by this litigation. The record indicates without refutation that ASARCO filed its motion to intervene on June 6, 1988, only 73 days after it received the March 21, 1988, letter from Interior through which ASARCO actually discovered that its Spanish Gulch claims were suspended by the preliminary injunction. Thus, the only remaining question is whether ASARCO can be ascribed with constructive notice before this event. Nothing in the record before us indicates that this question could be answered in the affirmative.

The only possible event that might be construed to have put ASARCO on notice that its interests were at stake in this case would be the February 10, 1986, publication of the preliminary injunction order in the *Federal Register*. However, as the opinion of the District Court notes, the publication in the *Federal Register* was not specific enough vis-a-vis the exact lands affected to "alert even the most careful reader that defendants' classification terminations should inspire protest." *National Wildlife Federation v. Burford*, 676 F.Supp. at 282. Thus, there was no way that this publication could have given ASARCO notice that its Spanish Gulch claims were in jeopardy.

 It is clear, then, that ASARCO could not have been required to intervene to protect its Spanish Gulch claims before it received the letter from the BLM notifying it that these claims would be disrupted. Accordingly, we reverse the District Court's finding that ASARCO's intervention with respect to these claims was untimely. We do agree with the District Court, however, that any other generalized claims (besides the particularized Spanish Gulch claims) that ASARCO wished to raise in this litigation should have been brought in a timely fashion after the *Federal Register* publication of these proceedings; this publication provided sufficient notice of the agency action to arouse any *general* challenges ASARCO may have

had. We therefore hold that ASARCO is entitled to bring only its Spanish Gulch claims in District Court because only these claims were timely filed.

We emphasize that we find only that ASARCO's Spanish Gulch claims were timely filed. Because the District Court has not yet considered ASARCO's motion for intervention on the merits, we do not require intervention; instead, we leave the scope of relief to be determined by the District Court. We also note that since we have not reinstated the preliminary injunction that initially produced ASARCO's alleged injury, administrative remedies may now become available to ASARCO that will render intervention altogether unnecessary. Therefore, we remand to the District Court for consideration of ASARCO's motion to intervene under the remaining requirements of Rule 24(a) of the Federal Rules of Civil Procedure.

III. Conclusion

We reverse and remand the District Court's summary judgment against NWF on grounds of standing, because we find that the Federation has shown injury-in-fact more than enough to withstand summary judgment on this issue. Moreover, to find otherwise would contravene the law of the case. The District Court must now address NWF's claims on the merits and fashion whatever relief it deems appropriate. We further find that the District Court's refusal to consider NWF's supplemental affidavits was an abuse of discretion, and direct the court to take into consideration any appropriate further submissions from the parties necessary to a proper resolution. We decline, however, to reinstate the preliminary injunction because the case should now proceed with dispatch.

We also reverse the trial court's finding that ASARCO's motion to intervene with respect to its Spanish Gulch claims was untimely filed. We remand this issue to the District Court for consideration of the question whether ASARCO is an appropri-

ate intervenor of right given our disposition of the other issues in this case.

*So ordered.*