**NATURAL RESOURCES DEFENSE COUNCIL, INC., et al., Plaintiffs,**

**v.**

**Delos Cy JAMISON, et al., Defendants,**

**and**

**National Coal Association/American Mining Congress, et al., Intervenor–Defendants.**

**Civ. A. No. 82–2763.**

United States District Court, District of Columbia.

June 6, 1990.

232

Lloyd Thomas Galloway, Galloway &
Greenberg, Eldon VanCleef Greenberg,
Garvey, Schubert & Barer, Hope M. Bab-
cock, National Audubon Soc.,. General
Counsel, John D. Echeverria, Glenn P. Su-
gameli, Norman Leon Dean, Jr., Washing-
ton, D.C., for plaintiffs.

Alfred Thomas Ghiorzi, U.S. Dept. of
Justice, Environment & Natural Resources
Div., Washington, D.C., for defendants.

Timothy Biddle, Cromwell & Moring,
Warner Gardner, Shea & Gardner, Wash-
ington, D.C., David S. Hemenway, Peabody
Holding Co., Inc., St. Louis, Mo., Eugene
D. Gulland, Covington & Burling, Allan W.
Anderson, Gerry Levenberg, Steven P.
Quarles, Crowell & Moring, Washington,
D.C., for intervenor-defendants.

## MEMORANDUM

BRYANT, District Judge.

The issue of plaintiffs' standing to bring
this suit is once again before this court,

having granted, on November 9, 1989, plaintiffs' motion for reconsideration of the court's November 1, 1988 grant of summary judgment in favor of the defendants on the grounds that plaintiffs failed to show that they had standing to maintain this action. Plaintiffs, various environmental groups and organizations of residents of western states, have filed fifteen affidavits and a memorandum in support of their standing to pursue their challenge to certain rules promulgated by the Department of the Interior ("Department") in July 1982 and February 1986. The rules amend a number of 1979 regulations, which govern the national program for the management, which includes leasing and mining, of federally-owned coal.

Defendants have moved again for summary judgment in their favor on all claims except as to the Departmental rules regarding "surface owner" consent. Defendants base their motion upon their interpretation of the burden of proof at this juncture, which they assert requires plaintiffs to prove that the evidence advanced to support standing demonstrate injury-in-fact, causation, and redressability. In this regard, defendants argue that plaintiffs alleged injuries are too remote, speculative, and vague to provide plaintiffs with standing to bring their claims and to confer upon the court Article III jurisdiction.

*Standing Doctrine*

■ The question of standing demands a determination of "whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975). Standing involves justiciability limitations imposed by the "case or controversy" requirement of Article III, § 2 of the Constitution and "prudential limits on its exercise." *Id.* Essentially, the court must determine whether the plaintiff has "alleged such a personal stake in the outcome of the controversy" so as to warrant her invocation of federal-court jurisdiction, *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962), and "to justify exercise of the court's remedial powers on [her]

behalf." *Warth v. Seldin,* 422 U.S. at 498–99, 95 S.Ct. at 2205. As true in 1977 as today, Judge Skelly Wright observed of these Article III requirements:

> While that much remains clear and has its roots in the Constitution, application of the principle to a particular complaining party has become difficult in the wake of rapidly developing case law.

*Animal Welfare Institute v. Kreps,* 561 F.2d 1002, 1005 (1977). The court notes that for such reasons as these the court granted plaintiffs' motion for reconsideration.

■ The Supreme Court has interpreted the constitutional elements of the standing requirement "as embracing three separate, yet necessarily intertwined components: ..., (1) 'some actual or threatened injury' that (2) 'fairly can be traced to the challenged action' and (3) 'is likely to be redressed by a favorable decision.'" *National Wildlife Federation v. Hodel,* 839 F.2d 694, 704 (D.C.Cir.1988) ("*NWF v. Hodel*") (quoting *Valley Forge Christian College v. Americans United for Separation of Church and State,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982)). This requisite injury can be neither to abstract interests, *e.g. Sierra Club v. Morton,* 405 U.S. 727, 739, 92 S.Ct. 1361, 1368, 31 L.Ed.2d 636 (1972) (Mere interest in a problem is not sufficient to confer standing); *Schlesinger, Secretary of Defense v. Reservists Committee to Stop the War,* 418 U.S. 208, 223, n. 13, 94 S.Ct. 2925, 2933, n. 13, 41 L.Ed.2d 706 (1974) ("[T]he abstract injury in nonobservance of the Constitution" insufficient to confer standing), nor a "generalized grievance shared in substantially equal measure by all or a large class of citizens," *Warth v. Seldin,* 422 U.S. at 499, 95 S.Ct. at 2205. *See Allen v. Wright,* 468 U.S. 737, 754, 104 S.Ct. 3315, 3326, 82 L.Ed.2d 556 (1984) ("[A]n asserted right to have the Government act in accordance with law is not sufficient, standing alone, to confer jurisdiction on a federal court").

■ This "distinct and palpable injury," *Warth v. Seldin,* 422 U.S. at 501, 95 S.Ct. at 2206, however, "need not be important

or large; an 'identifiable trifle' can meet the constitutional minimum." *National Wildlife Federation v. Burford,* 878 F.2d 422, 430 (D.C.Cir.1989) ("*NWF v. Burford II*") (quoting *United States v. Students Challenging Regulatory Agency Procedures* ("*SCRAP*"), 412 U.S. 669, 689 n. 14, 93 S.Ct. 2405, 2417 n. 14, 37 L.Ed.2d 254 (1973)). Injury to aesthetic or recreational interests, environmental well-being, shared my many, will support a claim of standing. *Sierra Club v. Morton,* 405 U.S. at 734, 92 S.Ct. at 1366 ("Aesthetic and environmental well-being, like economic well-being, are important ingredients of the quality of life in our society, and the fact that particular environmental interests are shared by the many rather than the few does not make them less deserving of legal protection through the judicial process").

Personal injury may be "actual or threatened;" *Valley Forge,* 454 U.S. at 472, 102 S.Ct. at 758, and while the mere threat of an injury may appear, at first blush, to be noncognizable in a judicial system such as ours, whose jurisdiction is limited by the "cases or controversies" requirement of Article III, the Supreme Court has accommodated allegations of threatened injury in two contexts. The first of these involves cases in which the plaintiff alleges that the governmental action will be taken directly against the plaintiff. In that regard, the court must assess "the likelihood that the clash between the government and the plaintiff will in fact occur." *Wilderness Society v. Griles,* 824 F.2d 4, 11 (D.C.Cir. 1987) ("*WS v. Griles*"). The second context in which courts have deemed threatened injury sufficient to confer standing comprises cases in which the government acts directly against a third party, whose expected response will in turn injure plaintiff. In these so-called three-party cases, the determination of standing turns not on the existence of personal injury, but rather on so-called causation issues—"whether the third party's decision is sufficiently dependent upon the governmental action that plaintiff's injury is 'fairly traceable' to that action and is 'likely to be redressed' by an order binding the government." *Id. See, e.g., Allen v. Wright; Warth v. Seldin.*

However, when the existence of personal injury is at issue in the three-party case, it usually turns on a determination of "how likely it is that the third party's response to the challenged governmental action will injure the plaintiff *at all*," *WS v. Griles,* 824 F.2d at 12 (emphasis in original),—occurring in the same location as the third party's response to the challenged governmental action, in cases involving putative environmental injuries, *id.* at 15.

The second prong of the standing inquiry is causation. This "logical nexus" requirement, *Flast v. Cohen,* 392 U.S. 83, 102, 88 S.Ct. 1942, 1953–54, 20 L.Ed.2d 947 (1968), has not, however, been uniformly interpreted. *Compare Flast,* 392 U.S. at 102, 88 S.Ct. at 1953–54 (Taxpayer must establish logical nexus between "status and type of legislative enactment attacked" and "status and the precise nature of the constitutional infringement"), *with Schlesinger,* 418 U.S. at 225 n. 15, 94 S.Ct. at 2934 n. 15 ("*Flast* nexus test is not applicable where the taxing and spending power is not challenged"). As discussed, *supra,* in the context of three-party cases, the "mere indirectness of causation is no barrier to standing, and thus, an injury worked on one party by another through a third party intermediary may suffice." *NWF v. Hodel,* 839 F.2d at 705. This Circuit has held: "We are concerned here not with the length of the chain of causation, but on [sic] the plausibility of the links that comprise the chain." *Public Citizen v. Lockheed Aircraft Corporation,* 565 F.2d 708, 717 n. 31 (D.C.Cir.1977).

The final prong of current constitutional standing analysis is redressability. "Redressability and causation analysis often replicate one another, particularly in cases where, as here, the relief requested is merely the cessation of illegal conduct." *NWF v. Hodel,* 839 F.2d at 705. Courts have interpreted this requirement to have been fulfilled when plaintiff has demonstrated that a favorable decision is *likely* to redress his injury—"a party seeking judicial relief need not show to a certainty that a favorable decision will redress his injury." *NWF v. Hodel,* 839 F.2d at 705. *See*

*Hazardous Waste Treatment Council v. U.S. Environmental Protection Agency,* 861 F.2d 270, 273 (D.C.Cir.1988) ("Our decision (favorable to the plaintiff) is at least a necessary first step on a path that could ultimately lead to relief fully redressing [plaintiff's] injury").

As to the prudential limits on the court's exercise of its jurisdiction, which may require a denial of standing "if as a matter of judicial self-restraint it seems wise not to entertain the case," 13 C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure: Jurisdiction 2d § 3531, plaintiff "must plausibly ... assert that the injury is arguably within the zone of interests protected or regulated by the law on which the complaint is founded." *Action Alliance of Senior Citizens of Greater Philadelphia v. Heckler,* 789 F.2d 931, 936 (D.C.Cir.1986). "Essentially, the standing question in such cases is whether the constitutional or statutory provision on which the claims rest can properly be understood as granting persons in the plaintiff's position a right to judicial relief." *Warth v. Seldin,* 422 U.S. at 500, 95 S.Ct. at 2206 (footnote omitted). Summarizing Article III and prudential limitations, this Circuit has judged:

> The standing inquiry focuses on the substance of the agency action, its adverse impact on the plaintiff, and the types of interests that the applicable law is designed to protect. The would-be plaintiff's interest in the relevant law is ascertained by injury in fact; the law's interest in the would-be plaintiff is determined by the 'zone of interests' test. Mutuality of interest must be credibly asserted.

*Capital Legal Foundation v. Commodity Credit Corporation,* 711 F.2d 253, 259 (D.C.Cir.1983).

### Summary Judgment Burden

Some discussion of the burdens of both the movant and non-movant at summary judgment, as well as the degree of specificity this Circuit has required of litigants asserting threatened environmental injury of this kind, is necessary, since there is some question as to whether this court's November 1, 1988 order correctly granted defendants' motion for summary judgment on standing grounds. Plaintiff argues that "[t]o prevail, defendants must prove that the plaintiff's standing claims 'were sham and raised no genuine issue of fact.'" Plaintiffs' Memorandum in Support of Their Motion for Reconsideration at 16 (quoting *SCRAP,* 412 U.S. at 689 & n. 15, 93 S.Ct. at 2417 & n. 15). Although unclear, it would appear that plaintiffs are arguing that defendants. must do more than merely deny plaintiffs' allegations of injury-in-fact.

It is generally true that "the party opposing the motion for summary judgment bears the burden of responding *only after* the moving party has met its burden of coming forward with proof of the absence of any genuine issue of material fact." *Celotex Corporation v. Catrett,* 477 U.S. 317, 321, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986) (quoting *Catrett v. Johns–Mansville Sales Corporation,* 244 U.S.App.D.C. 160, 163, 756 F.2d 181, 184 (1985)) (emphasis in original). When, however, the nonmoving party has the burden of proof as to an issue as do the plaintiffs in this case as to standing,[1] "[t]he moving party is 'entitled to a judgment as a matter of law' because the non-moving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Id.* 477 U.S. at 323, 106 S.Ct. at 2553. *Celotex*

---

1. To say that the plaintiffs have the burden of proving standing is, perhaps, a bit of a misnomer, since it is rather the case that in determining whether the court has Article III jurisdiction, the focus is on plaintiff, not on the claim, and rarely on the defendant—in the latter instance, inquiry implicates questions related to whether the defendant has a sufficient interest to present a justiciable controversy with the plaintiff. 13 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure: Jurisdiction 2d, § 3531. But it is beyond cavil to suggest that it is otherwise than the plaintiff's duty to present the court with enough evidence—with sufficient specificity—to meet this threshold justiciability requirement and confer upon the court the "cases and controversies" constitutional prerequisite. Defendant need only raise the question of plaintiff's right to invoke the jurisdiction of the court.

clearly points out that "the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325, 106 S.Ct. at 2554. The moving party, where the nonmoving party bears the burden or proof, need not produce evidence showing the absence of a genuine issue of material fact. *Id.* Hence, in the instant case, defendants need only have—and did—point to the fact that plaintiff's claims of injury were too speculative and remote and lacked the specificity required to survive a motion for summary judgment.[2]

As to the level of specificity required in environmental cases such as this, where the alleged injury involves access to land in a three-party case, e.g., *Sierra Club v. Morton*, *SCRAP*, and *WS v. Griles*,

> the judgment regarding the likelihood of injury turns on whether the plaintiff's future conduct will occur in the *same location* as the third party's response to the challenged governmental action. Otherwise, the threat of injury would be too amorphous or uncertain ...

*WS v. Griles*, 824 F.2d at 12 (emphasis added). Standing "does not require meticulous specificity," *National Wildlife Federation v. Burford* 835 F.2d 305, 312 (1987) (*"NWF v. Burford I"*) but does require plaintiffs to point to specific lands that they wish to use that will be affected by the agency's regulation or action. *See WS v. Griles* at 15 (The absence of specificity regarding the location dooms plaintiffs' claims of threatened injury); *NWF v. Hodel*, 835 F.2d at 312 (On a motion for summary judgment, plaintiff will have to show injury with greater specificity). Although plaintiffs consider such a requirement to "exalt[ ] form over substance," Plaintiffs' Memorandum in Support of Their Motion for Reconsideration at 15, it is not enough that plaintiffs have a generalized interest in preserving the use and enjoyment of land.[3]

■ Defendants, on the other hand, also misconstrue the nature of proof that plaintiff must proffer to survive a motion for summary judgment on standing grounds. Plaintiffs need not *prove*, as argued by defendants, that the evidence demonstrates injury-in-fact, causation and redressability. Memorandum of Federal Defendants' in

**2.** Plaintiffs seem to question the court's authority to enter summary judgment *sua sponte*, claiming that the issuance of such an order would have been improper, since the moving party did not raise the issue of sufficiency of proof—and not having raised the issue of sufficiency of proof, defendants' motion could be nothing more than a motion to dismiss. Fed. R.Civ.P. 12(b)(6). In this regard, the Supreme Court has recognized that "district courts ... possess the power to enter summary judgment *sua sponte*, so long as the losing party was on notice that she had to come forward with all of her evidence." *Celotex Corporation v. Catrett*, 477 U.S. 317, 326, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). As to this notice requirement, this court concluded that plaintiffs should have known of their obligation to augment the record as to their assertion of standing because defendants had specifically moved for summary judgment and plaintiffs, among which is a large number of national environmental groups, "are undoubtably well aware of the developments in standing jurisprudence." Memorandum Opinion at 13 n. 2. Moreover, the substantial length of time that had elapsed provided plaintiffs with more than sufficient time in which to conduct discovery in support of standing—as they had with regard to their substantive claims.

**3.** As to the likelihood that third parties—successful bidders at future lease sales—will respond to government action with developmental activities and such activities will result in environmental harm, plaintiffs in their Motion for Reconsideration point to the Administrative Record. So too the Administrative Record is cited as to plaintiffs' newly asserted procedural and informational claims with reference to plaintiffs' Counts IV, V, VII, VIII, and XI. In this regard, plaintiffs must once more be reminded of the burden and the nature of proof that they must put forward with regard to the issue of standing. This Circuit, relying upon *Nissho–Iwai Am. Corp. v. Kline*, 845 F.2d 1300, 1307 (5th Cir.1988), where the court determined that it need not search the entire record in a case and find it bereft before summary judgment may be properly entered, concluded that appellant's failure to designate and reference facts at issue was fatal to its opposition. *Frito–Lay, Inc. v. Barton Willoughby*, 863 F.2d 1029, 1034 (D.C.Cir.1988). Cf. *Thompson v. Evening Star Newspaper Co.*, 394 F.2d 774, 777 & n. 9 (D.C.Cir.1968) (District Court not obliged to consider nonmovant's deposition, which was merely "generally incorporated ... without reference to any portion thereof as setting forth facts").

Opposition to Plaintiffs' Standing at 1. It is well established that for the purposes of ruling on a motion for summary judgment the evidence presented to the court must always be construed in favor of the party opposing the motion, who is given the benefit of all inferences that can be drawn from it. 10A Wright, Miller, & Kane, *supra,* at § 2727. *See Adickes v. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). *Accord United States v. General Motors Corporation,* 565 F.2d 754, 757 (D.C.Cir.1977) (The party opposing the motion for summary judgment is entitled to all favorable inferences, and in that regard, "general trustworthiness of predictions" will not be considered).

Hence, plaintiff need only present sufficient evidence from which the court can infer the existence of the constitutional elements of standing.[4] In a closely related case, the Circuit admonished the district court that it "must resolve any factual issues of controversy in favor of the non-moving party, even when the issue of harm and the issue on the merits are intertwined." *NWF v. Burford II,* 878 F.2d at 431. Moreover, the legislative history and the very act of Congress in enacting certain legislation, "can provide legislative assessments which courts can credit in making standing determinations." *NWF v. Hodel,* 839 F.2d at 708. *See also Autolog v. Regan,* 731 F.2d 25 at 31 (D.C.Cir.1984) ("[W]e must give great weight to this congressional finding in our standing inquiry"); *Animal Welfare Institute v. Kreps,* 561 F.2d at 1010 (emphasis added) ("[W]e believe that Congress, in enacting the MMPA, established *as a matter of law* the requisite casual relationship between American importing practices and South African sealing practices").

*Associational Standing*

There is no question that an association may have standing in its own right to seek judicial relief from injury to itself

and to vindicate whatever rights and immunities the association itself may enjoy. Moreover, in attempting to secure relief from injury to itself the association may assert the rights of its members, at least so long as the challenged infractions adversely affect its members' associational ties.

*Warth v. Seldin,* 422 U.S. at 511, 95 S.Ct. at 2211.

### Associations' Procedural and Informational Interests

■ Deprivation of information necessary for an organization's purposes has been judged sufficient injury to support such organization's standing to sue. *See Havens Realty Corporation v. Coleman,* 455 U.S. 363, 379, 102 S.Ct. 1114, 1124–25, 71 L.Ed.2d 214 (1982) (Organization's impaired ability to provide counseling services constitutes injury-in-fact—"far more than simply a setback to the organization's abstract social interests"). Reduction or restriction of that flow of information, necessary to further legitimate organizational interests, as alleged in the instant case, has also been deemed sufficient to confer standing on plaintiff. *Action Alliance of Senior Citizens,* 789 F.2d at 937 (Standing based upon concrete organizational interests detrimentally affected by regulation that restricted the flow of information).

Plaintiffs also contend that "the government action will directly infringe participatory interests[, which] constitutes the requisite injury to provide standing." Plaintiffs' Memorandum in Support of Their Motion for Reconsideration at 7. This court is in agreement, thereby joining the growing number of circuits that have recognized agency violations of procedural rights as constituting injury-in-fact to associations for which such procedures fulfill necessary organizational goals. *Defenders of Wildlife, Friends of Animals v. Hodel,* 851

---

4. Defendant, as movant, may still succeed at summary judgment on the standing issue, after plaintiff has satisfied his 'burden,' if defendant then demonstrates to the court that plaintiff's allegations are a "sham and raise[ ] no genuine issue of fact." *United States v. SCRAP,* 412 U.S. 669, 689, 93 S.Ct. 2405, 2417, 37 L.Ed.2d 254 (1973). Defendants, in response to plaintiffs' submissions on reconsideration, argue that plaintiffs have still not provided enough evidence to withstand a motion of summary judgment on the standing issue, but do not provide any evidence that plaintiffs' allegations are a sham, raising no genuine issue of fact.

F.2d 1035, 1040–41 (8th Cir.1988). *See also Trustees for Alaska v. Hodel,* 806 F.2d 1378, 1380 (9th Cir.1986) (Environmental groups have standing to challenge alleged agency violations of procedural rights); *Munoz–Mendoza v. Pierce,* 711 F.2d 421, 428 (1st Cir.1983) ("Article III of the Constitution does not require plaintiff to show that use of a mandated procedure [of which plaintiffs are deprived] would change an agency's substantive decision" in order to confer standing on the court). In this regard, the various environmental groups,[5] which have "a longstanding concern for the natural and human environment, and, in particular, for the adverse impacts on that environment that are associated with the mining and use of coal" Complaint at 7, ¶ 18, and which bring this action, clearly have as goals in common the desire to improve the management of federally owned lands and resources, including, in particular, the management of federally owned coal. Complaint at 4–6, ¶¶ 9–18. In the past, plaintiff organizations, in an effort to further these goals and objectives, have submitted testimony in Congress regarding coal leasing laws, policies, and activities and commented on proposed leasing regulations, as well as endeavored to inform the public of the environmental impacts of coal development. *Id.* at 7, ¶ 17. Inarguably, information and procedural and participatory opportunities provide access to and methods by which these groups' goals may be effectuated.

In order to determine whether plaintiffs' impairment of informational or participatory interests constitutes harm sufficient to confer standing, the analysis looks to the traditional constitutional limitations on the exercise of the court's jurisdiction. Plaintiffs allege (Count IV) that the Department's nonobservance of the Federal Land Policy and Management Act of 1976, 43 U.S.C. §§ 1701 *et seq.* ("FLPMA") by failing to prepare Resource Management Plans ("RMPs"), has denied these various organizations of this procedure as pre-scribed by the Act—the right to participate in the development of the RMPs—and denied them the "information as would be made available to them were RMPs prepared." Plaintiffs' Memorandum in Support of Their Standing at 10. In Count V, plaintiff organizations charge that the Department's failure to include "reclaimability" as an unsuitability criterion during land use planning, rather than at the mine plan review stage, is in violation of the Surface Mining Control and Reclamation Act of 1977, 30 U.S.C. §§ 1201–1328 ("SMCRA") and denies them the opportunity "to participate in planning efforts that assess the technological and economic feasibility of reclaiming lands being considered for lease," *id.* at 12, and the information so garnered. Similarly, plaintiffs contend (Count VI) that the failure of the Department to subject all lands to the federal lands unsuitability review process denies plaintiff organizations and its members the opportunity to participate during land use planning with regard to the application of the unsuitability criteria to leased lands and obtain and exchange information at that particular stage of the proceedings. Finally, plaintiffs argue (Count VIII) that they have been deprived of adequate opportunities to comment on the application of unsuitability criteria in the setting of proposed regional coal leasing levels, in violation of FLPMA and SMCRA. Such elimination of public participation opportunities is asserted to have harmed plaintiff organizations' interests by diminishing their ability to adequately represent their membership.

In short, plaintiffs contend that they have been denied participatory and informational rights as guaranteed by statute. Such harm has been caused by the federal defendants' "failure to promulgate regulations providing for such opportunities," *id.* at 19, and will be remedied by a ruling that the provision of such procedures and public participation opportunities is required by the relevant statutory authority and an or-

---

5. Plaintiffs are National Resources Defense Council, Inc., Sierra Club, National Wildlife Federation, National Audubon Society, Environmental Policy Institute, Northern Plains Resource Council, Western Organization of Resource Councils, and Powder River Basin Resource Council.

der mandating such. Defendants, on the other hand, argue that plaintiffs have nevertheless been provided with some other opportunities for public participation, generally at later stages in the coal leasing process. This court, however, is of the view that the fact that there still remains some procedure—though different—and some avenues of public participation—though not as much, does not deprive plaintiffs of standing. Plaintiffs need not prove that these procedures and informational opportunities, of which they were deprived, are superior or that what remains is inadequate. *See Munoz–Mendoza v. Pierce*, 711 F.2d at 428. It is enough if such procedures and informational opportunities are alleged to be statutorily authorized—bearing in mind that such factual and legal determinations, with regard to a finding of justiciability and absent a showing of "sham," will be resolved in favor of the nonmoving party, "even when the issue of harm and the issue on the merits are intertwined." *NWF v. Burford II*, 878 F.2d at 431.[6]

### Associational Standing to Bring Claims of Members

An association may also bring an action on behalf of its members, for harm incurred to one or more, even in absence of injury to itself—as well as on its own behalf, for its own injury, *supra* at 12–14.

The association must allege that its members, or any one of them, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit. So long as this can be established, and so long as the nature of the claim and of the relief sought does not make the individual participation of each injured party indispensable to proper resolution of the cause, the association may be an appropriate representative of its members, entitled to invoke the court's jurisdiction.

*Warth v. Seldin*, 422 U.S. at 511, 95 S.Ct. at 2211–12 (citing *Sierra Club v. Morton*, 405 U.S. at 734–741, 92 S.Ct. at 1366–69). In this regard, this Circuit has enunciated a three part test for "associational standing," *Hunt, Governor of North Carolina v. Washington State Apple Advertising Commission*, 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977), which requires the organization to show that

(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

*American Legal Foundation v. Federal Communication Commission*, 808 F.2d 84, 89 (D.C.Cir.1987) (No associational standing where individuals, who have claims, are not members of the association—have no role in selecting association's leadership or guiding or financing its activities—and where there is no linkage between association's interest in the outcome of litigation and those of its supporters).

---

**6.** Industry intervenors, however, argue that these claims of informational or participatory standing are new and cannot be considered, since injuries of this type were only "tried" as to the now-dismissed National Environmental Policy Acts counts. Industry Intervenors' Opposition to Plaintiffs' Motion for Reconsideration at 6–7. Intervenors derive this prohibition from the rule that a motion to amend judgment "cannot be used to argue a case on a new legal theory." *Federal Deposition Insurance Corp. v. Meyer*, 781 F.2d 1260, 1268 (7th Cir.1986). This analogy to motion to amend judgments, in the cases cited by the defendants, is entirely inapposite. As intervenors acknowledge in a different context that the court has the authority to raise a standing issue *sua sponte*—in fact, has the

undelegable responsibility—since standing concerns the court's subject matter jurisdiction, a threshold constitutional requirement. Grounds raised and arguments presented to support standing relate to plaintiff's *status* with regard to his ability to invoke the court's jurisdiction. Hence, a plaintiff, as long as he presents sufficient evidence to the court, can neither create nor destroy the court's jurisdiction, by means of the way he frames his arguments. In this case, the court could have determined, without any edification by the plaintiffs, that they had standing on procedural and informational claims. Any theories presented by plaintiffs serve only to instruct and guide the court in its task of determining whether it has jurisdiction to hear the plaintiffs' case.

With regard to the second of this three prong inquiry, as discussed, *supra* at 14, it cannot seriously be argued that as to all of these organizations, the interests sought, in the instant case, to be protected—the quality of the natural and human environment—are anything but "germane" to these organization's purposes. Similarly, the third prong is satisfied where, as here, the association seeks "a declaration, injunction, or some other form of prospective relief." *Warth v. Seldin*, 422 U.S. at 515, 95 S.Ct. at 2213–14. In such cases, "it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured." *Id.* In fact, in all cases where the Court has recognized standing in associations to represent their members, relief has been of this kind. *E.g., National Motor Freight Association v. United States*, 372 U.S. 246, 83 S.Ct. 688, 9 L.Ed.2d 709 (1963); *Data Processing Service v. Camp*, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970). Likewise, since plaintiff organizations seek only declaratory and injunctive relief, associational standing to assert the claims of individual members is properly found, as long as the first prong is satisfied—individual members have standing to sue in their own right.[7]

Plaintiffs, in Count XI, contend that the regulations adopted by federal defendants in 1982 unlawfully extend the "diligent development" deadline established by the Federal Coal Leasing Amendments Act of 1976 ("FCLAA"), 30 U.S.C. § 207(a). Brant Calkins, a member of the Sierra Club, and Carolyn Johnson, a consultant-employee of the Natural Resources Defense Council, Inc. ("NRDC") and the Western Organization of Resource Councils, both claim to recreate "extensively in southern Utah where federal coal lands were leased three decades and more ago." [8] Plaintiffs' Memorandum in Support of Their Standing at 14.

Although the leases on these lands, which include wilderness study areas ("WSAs") as well as lands in the vicinity of Bryce Canyon National Park, have never produced coal for sale, they have not been cancelled and the mining companies have not given up their plans to mine them. Calkin Dec., ¶¶ 1, 8, 9. Should the companies in fact mine these lands, the resulting noise, degradation of air and scenic qualities and other impacts will injure [their] recreational interests … But for the government's unlawful extension of the due diligence deadline, the leases in the areas in which plaintiffs recreate would have been cancelled in 1986. Because the leases were not cancelled, mining and associated activities could take place which would destroy plaintiffs' recreational enjoyment of these areas. An order declaring the Interior Department's rule unlawful and requiring cancellation of pre-FCLAA leases that had not been diligently developed as of August 4, 1986 would eliminate that threat.

*Id.* at 14–15.

Plaintiffs here have alleged three-party injury, and in that regard, as required in environmental cases such as this, have pointed to specific land that they intend to use that could be mined and have claimed that the lease for which would have been canceled if the August 4, 1986 deadline were in effect. The fact that plaintiffs cannot provide proof that the coal leases in

7. Counts I, II, III, and VII have been dismissed as moot. In addition, as to Counts IV, V, VI, and VIII, the court has determined, *supra* at 13–17, that plaintiffs' organizations have standing to assert participatory and informational interests, infringed by federal defendants' alleged failure to comply with statutory mandate. The remaining claims, Counts IX, X, and XI, implicate individual grievances and are discussed *infra* at 19–26.

8. Given that "a District Court must resolve any factual issues of controversy in favor of the non-moving party, even when the issue of harm and the issue on the merits are intertwined," *National Wildlife Federation v. Burford*, 878 F.2d 422, 431 (D.C.Cir.1989) (Even though affidavits are ambiguous as to whether the adversely affected lands are the ones the plaintiff uses, plaintiff has alleged injury-in-fact sufficient to give her standing to sue, by resolving factual ambiguity in favor of plaintiff and by assuming that plaintiff used affected acres.), this court will assume that plaintiffs use the specific lands under lease.

question "are immediately in danger of development and that the threatened environmental injury would indeed occur," Memorandum of Industry Intervenors in Opposition to Plaintiffs' Standing at 9, is neither fatal to claim of standing nor renders the threatened injuries too speculative. It is entirely plausible or possible that this land could be mined, at least as long as mining companies hold leases permitting such activity. *Public Citizen v. Lockheed Aircraft Corporation,* 565 F.2d at 717. Moreover, it cannot be seriously argued that environmental damage does not occur as a result of coal development.[9] A brief review of SMCRA, FLPMA, and FCLAA supplies sufficient support for the proposition that Congress' recognition of this potentiality lead to the passage of these statutes which provide safeguards to protect the citizenry from needless environmental degradation and injury from coal development. *Animal Welfare Institute v. Kreps,* 561 F.2d at 1010; *NWF v. Hodel,* 839 F.2d at 708. *See* 43 U.S.C. § 1701(a)(8); 30 U.S.C. § 1201(c)–(e), (h); 30 U.S.C. 201(a)(3)(C). Causation is demonstrated by resort to the 'but-for' test used in *WS v. Griles,* 824 F.2d at 15 ("Any harm to plaintiffs that results from … implement[ation of] the new policy would not occur *but for* the policy"). But for the Department's failure to establish an August 4, 1986 deadline for development, there would be *no possibility* on coal development occurring on this land and likewise *no possibility* of environmental injury flowing from mining activities.

This court finds that the sentiment expressed in *NWF v. Hodel* is fully applicable in the present context: "NWF's allegations of injury in these affidavits, far from being 'an ingenious academic exercise in the conceivable,' *see SCRAP,* 412 U.S. at 688, 93

S.Ct. at 2416, are the allegations of real people personally concerned about constitutionally-sufficient environmental, recreational, or aesthetic injuries." 839 F.2d at 707. For the foregoing reasons, plaintiffs' submissions are deemed sufficient to confer standing to plaintiff organizations as to individual members' claim of violation of the diligent development requirement.

In Count X, Plaintiffs argue that the provision in the regulations for continued operations and extension of time allotted for the submission of an operation and reclamation plan is in violation of the mandate that holders of coal leases will submit such plans "not later than three years after" lease issuance. 30 U.S.C. § 207(c). Carolyn Johnson, *supra* at 19,

> recreates on or adjacent to areas of Utah which have been leased and for which the three year deadline for submittal of an operation and reclamation plan has not yet expired. Johnson Dec., ¶ 9. Mining pursuant to these leases would seriously harm her enjoyment of these areas. Should the three year deadline for submission for the plan be extended for these leases pursuant to the new rules, the threat to her interests will be perpetuated. Clearly an order striking down the rule would eliminate these threats.

Plaintiffs' Memorandum in Support of Their Standing at 15. As to the constitutionally mandated injury-in-fact requirement in such a three-party claim as this, it is plausible that coal operations on the land in Utah on which Ms. Johnson recreates will be "interrupted by strikes, the elements, or casualties not attributable to the operator/lessee," 30 CFR § 211.22(a)(1), and, in such a case, highly possible that such operator/lessee will not meet the

---

**9.** Plaintiffs contend that

the excessive leasing that will occur under the new coal program and the mining, transportation, and use of coal will cause significant socio-economic, cultural, and environmental impacts to land containing federal coal deposits and to surrounding areas. Among other things, soils and landforms, air quality, water quality and quantity, the visual environment, wildlife habitats, archeological and historic resources, recreational opportunities, agri-

cultural and timber production, commercial and industrial activities, and the recovery of other minerals will be affected. Rural communities will be forced to absorb vastly increased populations and will become urbanized. Since coal is a nonrenewable resource, potentially massive irreversible and irretrievable commitments of this resource could result.

Complaint at 10, ¶ 27.

three year deadline as mandated by FCLAA, 30 U.S.C. § 207(c).

Industry intervenors respond by claiming that plaintiffs' assertion that such "time extensions somehow will cause environmental injury" is "highly speculative, if not preposterous." Memorandum of Industry Intervenors in Opposition to Plaintiffs' Standing at 10. Plaintiffs would seem to respond by contending that the greater the length of time before which lessees are required to submit an operation and reclamation plan, the greater the threat of environmental harm and the more difficult planning for coal development impacts becomes. This court, for the purposes of this motion, will accept the proposition that a time extension for filing such a plan can increase the threat or cause increased environmental degradation, *see NWF v. Burford II*, 878 F.2d at 431, thereby resolving such factual issues in favor of nonmoving party, absent a showing by moving party that such a proposition is a "sham." Industry intervenors' bald assertion that "a time extension should lead to a better plan and decreased environmental consequences," *id.*, is simply insufficient to meet their burden. The court credits in its causation analysis Congress' concern over the environmental impact of coal development, which lead to the requirement of an operation and reclamation plan. Moreover, the court cannot ignore this section's seemingly mandatory language as indicative of a belief that more time—leastwise greater than three years—is likely to increase the risk of a "disturbance of the environment." 30 U.S.C. § 207(c). *NWF v. Hodel*, 839 F.2d at 714 ("Secretary Watt's regulation indisputably made such impoundments *more likely than previously*") (emphasis added). In addition, the delegation of authority to the Secretary to "approve or disapprove the plan or require that it be modified," 30 U.S.C. § 207(c), can be construed as indicating that the submission of such a plan is not perfunctory, but important to the reclamation of once developed land—that time may, in certain cases, be of the essence. Lastly, as to the requirement of redressability, it is beyond cavil that an order striking down this regulation would remove the alleged threat of environmental injury due to extensions of time granted to lessees within which they may file an operation and reclamation plan. Accordingly, this court concludes on this issue that plaintiffs have standing to assert claims of the aforementioned individual members.

Finally, plaintiffs contend that the new coal leasing regulations dealing with surface owners, 43 CFR Subpart 3427 (1982), fail to give lands to which owners have consented to leasing priority over those lands without such consent; to specify that refusals to consent last the life of the land use plans; and to provide any guarantees that leasing will not proceed without the consent of the qualified owners, in violation of the purpose, intent and terms of the surface owner provisions of SMCRA. Complaint at 36, ¶ 154. The fact that defendants and intervenors do not contest plaintiffs' standing as to this claim, does not relieve the court of its responsibility to determine whether the constitutional requirements of standing have been met.

This claim, unlike the preceding, is not a three-party claim with regard to plaintiff organizations' individual members' allegation of injury to procedural and informational rights as guaranteed by SMCRA—their assertions of environmental injury is a three-party claim, however. Helen Waller and Thomas Breitbach, both members of Northern Plains Resource Council and owners of land lying over unleased federal coal, intend to assert their respective opposition to the leasing of the federal coal under each's land. Ms Waller states that

> although she has read the Department's rules, she does not know what kind of evidence she must submit to be deemed qualified. Aller Aff., ¶ 4. Moreover, she knows that requests for information regarding the standards that will be used in judging qualifications have been denied. *See also* Johnson Dec., ¶ 12. Thus the evidence Ms. Waller submits may not be deemed sufficient to rebut the regulatory presumption against surface owner qualification and her land leased over her opposition.

Plaintiffs' Memorandum in Support of Their Standing at 16.

To the extent that defendants have made it more difficult for surface owners to prove qualification to object to leasing and removed any assurance that coal will not be leased without surface owner's consent, defendants have injured these individual's informational and participatory rights under SMCRA. Moreover, should coal development proceed, it cannot seriously be argued, as this court has previously discussed, that some environmental injury will occur, see 30 U.S.C. § 1201(c)–(e), (h), without the consent of surface owners. Moreover, it bears no further examination, that a ruling requiring the Department to implement regulations more in keeping with the SMCRA would provide redress for individual surface owners' threat of harm. Hence, plaintiff organizations have standing to bring this claim on behalf of its surface owners members.

*Prudential Standing Considerations*

■ Plaintiffs various claims are brought under three statutes: the Federal Leasing Amendments Act, Pub.L. 94–377, 90 Stat. 1083–1092, which amends the Mineral Leasing Act of 1920, 30 U.S.C. §§ 181 *et seq.*, under which all coal had been previously leased; the Federal Land Policy and Management Act of 1976, 43 U.S.C. §§ 1701 *et seq.*, which provides comprehensive guidance for the management of all federally-owned lands and resources under the jurisdiction of the Bureau of Land Management, and the Surface Mining Control and Reclamation Act, 30 U.S.C. §§ 1201 *et seq.*, which "establish[s] a nationwide program to protect society and the environment from the adverse effects of surface coal mining operations." 30 U.S.C. § 1202(a). To determine whether plaintiffs' claims fall within the prudential limits of the court's jurisdiction, the court must look to each of these three statutory schemes to ascertain whether plaintiffs have "plausibly ... assert[ed] that the[ir] injur[ies are] arguably within the zone of interests protected or regulated by the law on which the complaint is founded." *Action Alliance of Senior Citizens of Greater Philadelphia v. Heckler*, 789 F.2d at

936. This is not a rigid requirement favoring exclusion, see *Data Processing Service Organizations, Inc. v. Camp*, 397 U.S. at 154, 90 S.Ct. at 830 (Court approved "trend ... toward [the] enlargement of the class of people who may protest administrative action"), but rather, merely requires that the court ask itself the question: is the applicable law interested in, concerned with the would-be plaintiff and the protection of her interests? This question will be asked with reference to each of these statutory schemes, seriatim.

■ There is no question but that the Federal Land Policy and Management Act is interested in the views of the general public, *e.g.*, 43 U.S.C. §§ 1701(a)(5), 1712(a), 1739(e), and committed to the protection of "the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource and archeological values," for the benefit of the present and future citizenry. 43 U.S.C. § 1701(a)(8). Certainly, here, plaintiffs' interests, which they have asked the court to protect, are within the zone of interests to be protected by FLPMA. *Association of Data Processing Service Organizations, Inc. v. Camp*, 397 U.S. at 153, 90 S.Ct. at 829–30. Moreover, it is plausible that Congress "intended for [this] class [of plaintiffs] to be relied upon to challenge agency disregard of the law," *Block, Secretary of Agriculture v. Community Nutrition Institute*, 467 U.S. 340, 347, 104 S.Ct. 2450, 2454, 81 L.Ed.2d 270 (1984) (citing *Barlow v. Collins*, 397 U.S. 159, 167, 90 S.Ct. 832, 838, 25 L.Ed.2d 192 (1970)). Given the extensive coverage of this statute, the individual is in the best position to identify a particular violation of the law as it relates to specific land, because she, not the agency, is likely to be subjected to the effects of environmental degradation where she lives, works, or recreates as a result of such agency action. In addition, there is no reason to doubt that Congress, with its emphasis on public input in the public land use planning process, chose to rely, in part, upon groups of interested and informed citizens, such as plaintiff organizations, to be its eyes and ears, and would consider such organizations to

be "a reliable private attorney general to litigate the issues of the public interest in the present case." *Association of Data Processing Service Organizations, Inc. v. Camp*, 397 U.S. at 154, 90 S.Ct. at 830.

The Surface Mining Control and Reclamation Act presents an even more compelling case for including plaintiffs within the ambit of this statute's coverage, since among its purposes is the protection of society, 30 U.S.C. § 1202(a), and assurance that appropriate procedures are provided for the public to participate in "the development, revision, and enforcement of regulations, standards, reclamation plans, or programs." 30 U.S.C. § 1202(i). In particular, the Secretary is prohibited from "enter[ring] into any lease of Federal coal deposits until the surface owner has given written consent to enter and commence surface mining operations and the Secretary has obtained evidence of such consent." 30 U.S.C. § 1304(c). Clearly, here Congress intended that such organizations, as plaintiff organizations, representing the interests of members who are qualified surface owners, be given a role in the surface mining control and reclamation process and the monitoring of the agency's effectuation of the purposes and provisions of SMCRA.

As to claims brought pursuant to the Federal Coal Leasing Amendments Act of 1976, industry intervenors argue that plaintiffs are not within the zone of interests that this statute was designed to protect, because plaintiffs' *"anti-production* interest is inconsistent with the *pro-production* purpose" of this statutory scheme. Memorandum of Industry Intervenors in Opposition to Plaintiffs' Standing at 9 (emphasis in original). A look at the case, *Clarke, Comptroller of the Currency v. Securities Industry Association,* relied upon by industry intervenors for this proposition, reveals, instead, an intent that this zone of interest test "is not meant to be especially demanding; in particular, there need be no indication of congressional purposes to benefit the would-be plaintiff." 479 U.S. 388, 399–400, 107 S.Ct. 750, 757, 93 L.Ed.2d 757 (1987). In that regard, the Court instructs that only those plaintiffs

whose interests are "so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit" would be unable to invoke the court's jurisdiction. *Id.* at 399, 107 S.Ct. at 757. As to this inquiry, it is of less importance that a would-be plaintiff's views are consistent with the statute at issue, than whether there is *any* indication, however attenuated, that Congress intended to benefit such a class of plaintiffs.

Legislative history does reveal that among the purposes of these statutory amendments was the assurance that coal leasing and development would be "compatible with public interest" and the provision of "environmental safeguards which are essential to the long-term interests of the nation and the regions involved." H.R. 681, 94th Cong., 2d Sess. 8, *reprinted in* 1976 U.S.Code Cong. & Admin.News, 1943. The portion of FCLAA dealing with the prohibition of leasing lands containing coal absent the preparation of a comprehensive land use plan, 30 U.S.C. § 201(a)(3)(A)(ii), includes various opportunities for public comment with regard to "environmental disruption, community services, economic impacts and the like." H.R. 681 Cong., 2d Sess. 19, *reprinted in* 1976 U.S.Code Cong. & Admin.News at 1955. It is clear that Congress, at the very least, found so-called "antiproduction," pro-environmental concerns to be among those interests to be balanced with those speaking to the need for "an orderly procedure for the leasing and development of coal presently owned by the United States." *Id.* at 8, 1976 U.S.Code Cong. & Admin.News, at 1943. Hence, this court has little trouble deciding that there is at least *some* indication that Congress intended to benefit instant plaintiffs.

Accordingly, all claims brought pursuant to FCLAA, SMCRA, and FLPMA do not violate the court's prudential limitations on its jurisdiction.

## CONCLUSION

For the foregoing reasons, the court finds that plaintiff organizations have standing to bring Counts IV, V, VI, and

VIII, having alleged infringement of their procedural and informational interests and Counts IX, X, and XI on behalf of their members.

## ORDER

Upon consideration of the defendants' motion for summary judgment on standing grounds and memorandum in opposition to plaintiffs' standing, plaintiffs' memorandum in support of their standing and their reply to defendants' opposition, the entire record herein, in accordance with the memorandum filed this date, it is hereby

ORDERED that the court's November 1, 1988 grant of summary judgment in favor of the defendants is VACATED, and further

ORDERED that defendants' motion to dismiss on standing grounds is DENIED.